John and Constance BARCLAY; Royer and Althea Barclay; John Amos; Marcia J. Bacon; Ronald J. Bartel; Melvin Bergen; John E. Boyle; Jonathan and Florence Ehrlich; Donald Graumann; Ruben Kliewer; Alvin and Barbara Kroupa; Burdett Ledell; Lee Dale Miller; Vernon Minns; Frank A. Mitchell; Mid Kansas Cooperative Association; John F. Opat; Robert Presnell; Janet and Sonja Regier; Don and Janice Reinhardt; Mary J. Rodgers; Darrell Thompson; Robert Turner; Geneva and Donald Turnquist; Clark E. Wiebe; and Marlene J. Weber, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

No. 04–1119–WEB.

United States District Court, D. Kansas.

Dec. 29, 2004.

---

1. The court places no weight upon the absence of luggage in the back seat or the presence of water bottles in the back seat.

Cecilia Fex, Elaine A. Panagakos, Ackerson, Kauffman and Fex, PC, Washington, DC, Jeffrey R. Emerson, Foulston, Conlee, Schmidt & Emerson, LLP, Wichita, KS, for Plaintiffs.

G. Evan Pritchard, U. S. Department of Justice, Washington, DC, for Defendant.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

The plaintiffs allege that they are fee simple owners of properties in Kansas which are subject to easements for railroad purposes. According to the complaint, these railroad rights-of-way have now been converted to recreational trial use pursuant to a federal "rails to trails" statute.[1] Plaintiffs claim the conversion constitutes a taking of their property for public use which obligates the United States to provide just compensation under the Fifth Amendment. Relief is sought pursuant to the "Little Tucker Act," 28 U.S.C. § 1346(a)(2), in the form of damages, costs, interest, and other relief. The matter is now before the court on the

---

**1.** *See the National Trails System Act,* 16 U.S.C. § 1241 *et seq.* The Act provides for the conversion of unused railroad rights-of-way into recreational trails notwithstanding whatever reversionary property interests may exist under state law. *See Preseault v. I.C.C.,* 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990).

United States' Motion to Dismiss, which alleges that the claims are barred by the statute of limitations. The court finds that oral argument would not assist in deciding the issues presented.

## I. *Background.*

The background of the "rails-to-trails" act was explained in *Preseault v. Interstate Commerce Commission*, 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). Pursuant to its authority to regulate interstate commerce, Congress gave the Interstate Commerce Commission (ICC), and later the Surface Transportation Board (STB), exclusive authority over the construction, operation, and abandonment of the nation's rail lines. Rail trackage in the United States peaked at around 272,000 miles in 1920 and has declined significantly since them. *Id.* at 5, 110 S.Ct. 914. By 1990, only about 141,000 miles were in use, with 3,000 more miles expected to be abandoned every year. *Id.* Pursuant to statute and regulation, when a railroad operator wants to cease operations on a rail line it must file notice of its intent with the STB. The STB may authorize the abandonment only if it finds that public convenience and necessity require it. 49 U.S.C. § 10903(d). Once a carrier abandons a line pursuant to authority granted by the STB, the line is no longer part of the national transportation system. Abandonment of a rail line may trigger reversionary interests in the property because many railroads do not own the rights-of-way upon which they operate; they merely own easements or similar interests. Frequently these easements provide that the right-of-way reverts to the abutting landowner upon abandonment of rail operations.

In 1976, Congress passed the National Trails System Act, which was aimed at promoting the conversion of abandoned rail lines to recreational trails. *Id.* at 6–7, 110 S.Ct. 914. This Act encouraged the Government to promote conversion and authorized the ICC to delay disposition of rail property unless the property were first offered for sale on terms providing for public use. By 1983, Congress concluded these provisions had not been successful, and it amended the Trails Act to give the ICC authority to preserve rights-of-way not currently in service for possible future railroad use (called "rail banking") and to allow interim use of the land as recreational trails. *Id.* The amendments provide that a railroad wishing to cease operations along a particular route may negotiate with a State, municipality or private group that is prepared to assume financial and management responsibility for the right-of-way. If the parties reach an agreement, the land may be transferred to the trail operator for interim trail use, subject to ICC-imposed terms. If no agreement is reached, the railroad may be permitted to abandon the line entirely. *Id.* at 6–8, 110 S.Ct. 914.

Under implementing regulations, a railroad may apply to the STB for a Certificate of Interim Trail Use or Abandonment (CITU) or, in a proceeding involving the exemption of a route from STB regulation, a Notice of Interim Trail Use or Abandonment (NITU). The issuance of a CITU or NITU provides a 180–day period in which the railroad may, among other things, negotiate an agreement for interim trail use with a qualified trail operator. (This 180–day period may be extended by the STB). If an agreement is reached, interim trail use is thereby authorized. Federal law provides that if such interim use is subject to restoration for railroad purposes, "such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). This effectively preempts the operation of reversionary clauses under state property law and prevents the property from reverting to the abutting land-

owner. It has also given rise to claims, including the instant one, that the conversion constitutes a taking of private property for public use.

In *Preseault* the Supreme Court found the Trails Act was a valid exercise of Congress' power under the Commerce Clause. *Preseault*, 494 U.S. at 19, 110 S.Ct. 914. Moreover, it said even assuming that the conversion of a right-of-way to a trail constituted a "taking" of the property, the availability of a remedy under the Tucker Act rendered premature any claim that the taking was without just compensation. *Id.* at 16–17, 110 S.Ct. 914.

## II. *Summary of Relevant Facts.*

The following summary is from the complaint and the uncontroverted facts in defendant's motion to dismiss. The claims in the case relate to three separate recreational trails: the Meadowlark Trail; the Sunflower Trail; and the Flint Hills Nature Trail.

A. *The Meadowlark Trail.* The Union Pacific (UP) was the last railroad to hold the right-of-way in McPherson County, Kansas upon the properties of the plaintiffs identified in ¶ 6 of the complaint. On June 22, 1995, the UP filed a notice of exemption (*see* 49 CFR § 1152.50) to abandon its McPherson County railroad line (12.6 miles of railroad between mile post 518.0 near McPherson, Kansas, and milepost 530.6 near Lindsborg, Kansas). On August 18, 1995, the City of Lindsborg requested that a Notice of Interim Trail Use (NITU) be issued for this 12.6 mile line under the National System Trails Act (16 U.S.C. § 1247(d)) so as to enable the City to acquire the right-of-way for use as a recreational trial. Thereafter, the City submitted to the STB a statement of willingness to assume financial responsibility for interim trail use and rail banking in compliance with 49 CFR § 1152.29. On September 6, 1995, the UP responded that it was willing to negotiate with the City of Lindsborg concerning interim trail use.

On September 28, 1995, the STB issued and served a NITU imposing both a 180–day public use condition (42 U.S.C. § 10906) and a 180–day trail use/rail banking condition (16 U.S.C. § 1247(d)) in connection with the proposed abandonment. On March 26, 1996, the STB extended the NITU negotiating period by an additional 180 days, through September 22, 1996. A motion to extend the negotiating period was filed on September 18, 1996, which was granted by the STB on January 27, 1997, extending the negotiating period through March 21, 1997. On March 25, 1997, the STB extended the period through April 20, 1997.

On April 16, 1997, the UP issued a "Donative Quitclaim Deed" to the Central Kansas Conservatory [or Conservancy] Inc.(CKC), which purported to convey to CKC all of UP's right, title and interest to the real estate in the portion of the McPherson line being abandoned by UP. On the same day, the UP and CKC entered into a "Line Donation Contract" which stated that the contract and deed were made in accordance with and subject to the Trails Act. Since the contract and deed were executed, CKC has exercised exclusive control, pursuant to the Trails Act, over the location of the former railroad right of way in McPherson County, which is now known as the Meadowlark Trail.

B. *The Sunflower Trail.* The last railroad to hold the right-of-way in Marion and McPherson Counties upon the properties of the plaintiffs identified in ¶ 5 of the complaint was Central Kansas Railway, LLC ("Central Kansas"). On February 22, 1996, Central Kansas filed a notice of exemption under 49 CFR § 1152 to abandon this line (specifically, 33.4 miles from milepost 10 plus 2418 feet at or near Mar-

ion to milepost 43 plus 4505 feet at or near McPherson). The exemption was scheduled to become effective on April 12, 1996. On April 12, 1996, the STB issued a NITU and stayed the exemption for six months to permit Central Kansas to negotiate with Jennings & Co., which had filed a statement of willingness to assume responsibility for the line. The STB granted two additional extensions. The CKC filed a statement of willingness to assume responsibility for the trial and requested issuance of a NITU. On June 12, 1997, the STB issued a second NITU and postponed the effective date of the exemption until December 13, 1997. On September 19, 1997, Central Kansas issued to the Central Kansas Conservatory [or Conservancy] (CKC) a "Donative Quitclaim Deed" which purported to convey all of the railroad's right, title and interest in the real estate on the portion of the line that was to be abandoned by Central Kansas. The deed made reference to a "Line Donation Contract" between Central Kansas and the CKC dated June 6, 1997. Since this conveyance, CKC has exercised exclusive control, pursuant to the Trails Act, over the location of the former railroad right of way, which is now known as the Sunflower Trail.

C. *The Flint Hills Nature Trail.* The Flint Hills Nature Trail is a total of 64.4 miles in length. It is comprised of two different portions of railroad corridor that were originally subject to separate STB proceedings.

The first portion is 37.83 miles in length and lies in Osage, Lyon and Morris Counties between mile post 388.25 near Osage City, Kansas, and milepost 425.0 near Council Grove, Kansas. The last railroad to hold the right-of-way on the property of the Plaintiffs identified in ¶ 7 of the Complaint was the Missouri Pacific (MP), which merged with the UP in 1997. On December 7, 1993, MP served a notice of exemption (49 CFR § 1152) to abandon

this portion of its rail line. On October 31, 1994, a NITU was issued to allow MP to negotiate a trail use agreement with the Rails–to–Trails Conservancy (RTC).

The second portion of this corridor is 26.57 miles in length and lies in Dickinson and Morris Counties between milepost 451.57 near Herington, Kansas, and milepost 425.0 near Council Grove, Kansas. The last railroad to hold the right-of-way on the property of the Plaintiffs identified in ¶ 8 of the Complaint was also the MP. On March 2, 1995, MP served a notice of exemption (49 CFR § 1152) to abandon this portion of its rail line. On March 31, 1995, a NITU was issued to allow MP to negotiate a trail use agreement with the Rails–to–Trails Conservancy (RTC).

On December 18, 1995, MP notified the STB that, effective December 15, 1995, MP's Hoisington Subdivision, including the two portions described above, had been conveyed to the RTC in accordance with the Trails Act. That portion of the railroad right-of-way is now known as the Flint Hills Nature Trail.

On March 1, 1996, with the approval of MP, RTC conveyed these portions to the Seranta Farms School of Equestrian Arts. The STB then issued NITUs that vacated the previous ones and substituted Seranta as the new trail user. On July 14, 1997, the Kansas Horseman Foundation (KHF) and Seranta, with the approval of the UP, announced they had entered an agreement to transfer ownership of and management responsibility for the trail. On July 21, 1997, the STB again vacated the prior NITUs and issued a new one substituting KHF in lieu of Seranta as the interim trail manager.

D. *Alleged Takings.* Plaintiffs allege that they are fee simple owners of portions of land underlying these three trails; that the railroads abandoned their easements on the land; and that full ownership and

control of the land would have reverted to the plaintiffs but for the operation of the Trails Act. They allege the Government has not instituted condemnation proceedings or paid plaintiffs any compensation. Plaintiffs contend the conversion of the property for rail banking/interim trail use constitutes a taking of property for public use which obligates the Government to provide just compensation.

### III. *Motion to Dismiss.*

The parties agree the claims are subject to the limitations period in 28 U.S.C. § 2401(a). That section states in part that a civil action against the United States is barred unless the complaint is filed "within six years after the right of action first accrues." *Id.* Plaintiffs' complaint was filed April 7, 2004, meaning that unless the limitations period was tolled (an issue the court will discuss infra), the claims are barred if they accrued at any time before April 7, 1998.

The United States' motion to dismiss, which is asserted under Fed.R.Civ.P. 12(b)(1), argues that all of the claims accrued prior to April 7, 1998, and that as a result, the court lacks jurisdiction to hear the claims. *Citing, inter alia, Bray v. United States,* 785 F.2d 989, 992 (Fed.Cir. 1986); *Urabazo v. United States,* 947 F.2d 955, 1991 WL 213406 at *1 (10th Cir.1991) (unpublished). The Government notes that a cause of action for an unconstitutional taking accrues at the time the taking occurs. It contends the court need not determine precisely when any takings occurred, however, because all of the relevant dates in the complaint are prior to April 7, 1998. Additionally, the Government argues that the proper accrual date is the date upon which both a NITU had been issued and a trail use agreement was reached. *Citing Caldwell v. United States,* 57 Fed.Cl. 193 (2003).

Plaintiffs contend the Government's motion to dismiss is improperly asserted under Rule 12(b)(1), because the limitations issue is an affirmative defense upon which the Government bears the burden of proof, rather than an issue of subject matter jurisdiction for the plaintiffs to allege and prove. Plaintiffs further argue that the proper course is for the Government to file a motion to dismiss under Rule 12(b)(6), where the burden is on the Government to show there is no possible set of facts that would allow the plaintiffs to establish the timeliness of their claims. *Citing Supermail Cargo, Inc. v. United States,* 68 F.3d 1204, 1207 (9th Cir.1995). Lastly, plaintiffs argue that their claims are timely because the limitations period was tolled by the pendency of a class action suit. Plaintiffs note that on October 2, 1998, the plaintiff in *Swisher v. United States,* No. 98–1352 (D.Kan.) filed a complaint on behalf of a nationwide class of landowners whose property was taken for trail purposes pursuant to the Trails Act. On September 24, 1999—eleven months, three weeks and one day after the action was filed—the district court denied a motion to certify this class. *See Swisher v. United States,* 189 F.R.D. 638 (D.Kan.1999). Relying on *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), plaintiffs argue the limitations period was tolled during the pendency of this class action. Plaintiffs argue that when this "extra" period of nearly one year is considered, their claims were filed within the 6–year limitation period.

The parties have cited *Caldwell v. United States,* 57 Fed. Cl. 193 (2003) in their briefs, and they point out that this case, which involves issues similar to the instant case, has been pending on appeal before the Federal Circuit Court of Appeals. Plaintiffs argued that the motion to dismiss should be denied or deferred pending

a ruling by the Federal Circuit in *Caldwell*. The Federal Circuit has now issued its decision, *see Caldwell v. United States*, 391 F.3d 1226 (Fed.Cir.2004), and the decision constitutes controlling authority for purposes of this case. *See* 28 U.S.C. § 1295(a)(2) (granting Federal Circuit jurisdiction over district court decisions of non-tax claims under the Little Tucker Act). Accordingly, the court will apply the accrual rule announced by the Federal Circuit in *Caldwell*. The court notes that *Caldwell* has altered the assumption of both parties in this case that the existence of a trail use agreement is the event giving rise to a takings claim against the Government. Instead, the *Caldwell* panel found it is the issuance of a NITU (Notice of Interim Trail Use or Abandonment) that gives rise to a cause of action.

## IV. *Discussion.*

A. *Rule 12(b)(1) vs. 12(b)(6).* The six-year limit in § 2401(a) has previously been characterized as a jurisdictional condition attached to the Government's waiver of sovereign immunity. *See Bray v. United States*, 785 F.2d 989, 992 (Fed.Cir.1986). This might suggest that the time limit is a jurisdictional prerequisite which should be considered under Rule 12(b)(1), and which would not be subject to judicially created doctrines such as waiver, estoppel, and equitable tolling. *Cf. Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988)(noting that because parallel provision in § 2501 is a jurisdictional limitation rather than an affirmative defense, it is not capable of waiver or subject to estoppel). But in *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the Supreme Court found that limitation statutes like § 2401 are presumably subject to the same equitable tolling rules that apply to suits against private parties. *Cf. United States v. Brockamp*, 519 U.S. 347, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997). After

*Irwin*, courts have expressed some uncertainty over whether a motion of this sort raises a jurisdictional issue under Rule 12(b)(1) or whether it involves an affirmative defense governed by Rule 12(b)(6) standards. *See Harris v. F.A.A*, 353 F.3d 1006, 1013, n. 7 (D.C.Cir.2004) (declining to decide which standard is appropriate); *Lord v. Babbitt*, 943 F.Supp. 1203, 1209 (D.Alaska 1996) (applying Rule 12(b)(6)); *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206–07 (9th Cir.1995) (motion should be addressed under Rule 12(b)(6) standards and should be granted only if plaintiff could prove no set of facts that would establish the timeliness of the claim); *Diltz v. United States*, 771 F.Supp. 95, 97 (D.Del., 1991) (*Irwin* implicitly holds that compliance with the statute of limitations is not a jurisdictional prerequisite; consequently, the two-year limitation period of section 2401(b) does not implicate the court's subject matter jurisdiction and failure to comply with it is merely an affirmative defense, the burden of establishing that defense being upon the United States). *But cf. Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041, n. 4 (10th Cir.1980) ("While the statute of limitations is an affirmative defense, when the dates given in the complaint make clear that the right sued upon has been extinguished, the plaintiff has the burden of establishing a factual basis for tolling the statute."). The weight of authority after *Irwin* appears to be that such a motion is more properly treated under Rule 12(b)(6). *Cf. Venture Coal Sales v. United States*, 370 F.3d 1102, 1105 n. 2 (Fed.Cir. 2004)("The most precise ground for the trial court's decision here therefore would seem to be that [plaintiff] failed to make its claim within the required limitations period—that is not a question of subject matter jurisdiction of the court.").

The court determines that this dispute makes no practical difference here, be-

cause the facts relating to the statute of limitations appear to be undisputed. Even assuming the motion is more properly addressed under Rule 12(b)(1) than 12(b)(6), as the United States contends, the court would allow the plaintiffs an opportunity in these circumstances to amend their complaint to include allegations relating to the statute of limitations and to tolling, and if necessary it would permit them an additional opportunity to present any evidentiary materials to support the allegations. *Cf. Cedars–Sinai Medical Center v. Watkins,* 11 F.3d 1573, 1583–84 (Fed.Cir.1993) (noting that in a challenge to the factual basis for jurisdiction, the court is not restricted to the face of the pleadings, but may review evidence including affidavits and deposition testimony). Given the uncontroverted facts, however, the court finds such a procedure is unnecessary. The statute of limitations issue as presented is essentially one of law, with the relevant facts being undisputed. As such, whether Rule 12(b)(1) or 12(b)(6) controls is not material for purposes of the instant motion.

■ B. *Accrual of a right of action.* Under Section 2401(a), a civil action against the United States must be filed within six years after the right of action first accrues. A claim accrues for purposes of 28 U.S.C. § 2401(a) "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed. Cir.1998). In *Caldwell v. United States,* 391 F.3d 1226 (Fed.Cir.2004), a panel of the Federal Circuit concluded by a 2–to–1 majority that a "taking" occurs under the Trails Act (if at all) when state law rever-

sionary property interests that would otherwise vest in the adjacent landowners are blocked from vesting. *Id.* at 1233. In the context of an exemption proceeding like the instant case, this occurs when the railroad and a trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues a NITU that operates to preclude abandonment under 16 U.S.C. § 1247(d) of the Trails Act. *Id.* Thus, the issuance of a NITU is the triggering event for accrual of a "takings" claim under the Trails Act. *Id.* at 1235.[2]

C. *Tolling of the Limitations Period.* Before the court can determine if plaintiffs' claims were timely filed, it must examine not only when the claims accrued but also whether the limitations period was tolled at some point after accrual. Plaintiffs argue that the limitations period was tolled by the filing of a class action of which they were potential members. *See Swisher v. United States,* No. 98–1352 (D.Kan.).

In *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the State of Utah filed a civil action under the Sherman Act allegedly on behalf of a class of state and local agencies who were end-users of concrete and steel pipe sold by American Pipe and others. The suit was commenced 11 days before the statute of limitations would have expired on the claims of the potential class members. Several months later, the district court determined that the prerequisites for a class action were not met. Eight days after that, several of the purported class members moved to intervene in the case as individual plaintiffs. The

---

**2.** The *Caldwell* majority recognized that a NITU "operates as a single trigger to several possible outcomes," including the possibility that negotiations may fail, which could lead to abandonment of the easement. *Id.* at 1234.

In that circumstance, the court said, the taking of the property may be found to have been temporary rather than permanent, but the claim still accrued when the NITU was issued. *Id.* at 1234–35.

district court denied their motion, finding that the statute of limitations had expired on the claims of these plaintiffs. The Supreme Court ruled that the claims were timely, holding that the commencement of a class action lawsuit suspends the applicable statute of limitations as to all members of the class who would have been parties had the suit been permitted to continue as a class action. *Id.* at 554, 94 S.Ct. 756. In a later case, the Supreme Court applied the same rule to asserted class members who filed separate actions after the denial of class certification. *See Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345, 353–54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). Absent this rule, the Court noted, potential class members would have an incentive to file individual actions prior to a denial of class certification, in order to preserve their rights. This would defeat the principal purposes of the class action procedure—i.e., the promotion of efficiency and economy of litigation. The Court also noted that the rule was consistent with the statute of limitations' principal purpose of requiring fair and timely notice of claims, because the filing of a class action within the limitations period puts the defendant on notice of the nature and scope of the claims. *American Pipe,* 414 U.S. at 555, 94 S.Ct. 756.

Defendant argues that *American Pipe* tolling does not apply here because after the *Swisher* court denied the class certification, the plaintiffs still had ample time to file individual claims within the original limitations period. According to the defendant, *American Pipe* was only designed to protect plaintiffs whose claims would otherwise expire while a class action suit is pending. The defendant cites no authority for this argument, however, and the court cannot accept it as a valid limitation on the tolling rule announced in *American Pipe.* Nothing in the decision itself suggests such a limitation, and the Government's argument appears contrary to the Su-

preme Court's unqualified pronouncement that the filing of a class action "suspends" the applicable statute of limitations. *Cf. Chardon v. Fumero Soto,* 462 U.S. 650, 652, n. 1, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983) (using the term "tolling" to mean that the statute of limitations *ceases to run* ). Such a rule might also create incentives for potential class members to prepare and file separate actions as the end of the original limitations period approaches, something that is clearly at odds with the purpose of the tolling rule. In sum, the court rejects the argument that the plaintiffs cannot claim the benefit of *American Pipe* tolling.

█ On October 2, 1998, Cheryl Swisher filed a complaint in the U.S. District Court for the District of Kansas on behalf of a nationwide class of landowners whose property was allegedly taken by the United States under the Trails Act. (*Swisher v. United States,* No. 98–1352 (D.Kan.)). The district court denied a motion to certify the *Swisher* class on September 24, 1999. *Swisher v. United States,* 189 F.R.D. 638 (D.Kan.1999). The United States apparently concedes that the plaintiffs in the instant case were potential members of the *Swisher* class and that their claims were within the scope of the claims asserted in *Swisher.* Consistent with the *American Pipe* rule, the court concludes that the statute of limitations on plaintiffs' claims was suspended during the period from October 2, 1998, to September 24, 1999. *Cf. Caldwell,* 391 F.3d 1226, 1235 (finding the appellant waived his tolling argument on by raising the issue for the first time in a motion for reconsideration). As plaintiffs points out, the foregoing period was eleven months, three weeks, and one day.

*V. Application to plaintiffs' claims.*

1. *The Meadowlark Trail.* The STB issued a NITU pertaining to the Meadow-

lark Trail on September 28, 1995. The negotiating period was thereafter extended several times before a trail use agreement was entered into. Pursuant to the *Caldwell* decision, any "takings" claim relating to this trail accrued on September 28, 1995. Plaintiffs had a six-year period thereafter to file a claim relating to the Meadowlark Trail.

Plaintiffs' six year period ran until October 2, 1998, when the statute of limitations was suspended by the filing of the *Swisher* class action. At that point, plaintiffs had approximately three years (specifically, three years minus three days) left in the limitations period. The period commenced running again on September 24, 1999, when the *Swisher* class was denied. Plaintiffs thus had the same three year period (minus three days) thereafter to file their claims, or until September 21, 2002. The complaint in this case was filed on April 7, 2004, well outside this six-year period. Accordingly, the court finds that plaintiffs' claims relating to the Meadowlark Trail are barred by the statute of limitations in 28 U.S.C. § 2401(a).

2. *The Sunflower Trail.* The STB issued two NITU's relating to the Sunflower Trail. The first was issued on April 12, 1996. If this NITU is the triggering event for plaintiffs' takings claim, then under the same counting rules indicated above—including tolling of the period during the *Swisher* class action—the court calculates that the six-year limitations period ended on or about March 30, 2003. Because plaintiffs' complaint was not filed until April 7, 2004, well after the cut-off date, any claims arising by virtue of the first NITU are barred by § 2401(a).

■ The second NITU relating to the Sunflower Trail was issued on June 12, 1997. If this second NITU constituted the triggering event for a takings claim, then the six-year limitations period (again taking into account the portion tolled by

*Swisher* ) would have expired on or about June 4, 2004. Plaintiffs' complaint was filed prior to that time. Thus, a takings claim based on the second NITU would be timely under § 2401(a). Under the reasoning of *Caldwell*, however, the court must conclude that the issuance of the second NITU did not give rise to a separate cause of action, and therefore was not a triggering event for purposes of the statute of limitations. *Caldwell* recognized that issuance of a NITU "operates as a single trigger to several possible outcomes":

> It may, as in this case, trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked. Alternatively, negotiations may fail, and the NITU would then convert into a notice of abandonment. In these circumstances, a temporary taking may have occurred. It is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues.

*Caldwell,* 391 F.3d 1226, 1234 [citations and footnote omitted]. As *Caldwell* explained, it is the issuance of a NITU that "marks the 'finite start' to either temporary or permanent takings claims by halting abandonment and the vesting of state law reversionary interests when issued." *Id.* at 1234. *Caldwell* cited *United States v. Dow,* 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958), a case involving the accrual date for a takings claim where the Government took possession of certain property some three years before it obtained formal title to the property. According to *Caldwell,* the *Dow* Court rejected an argument that there had been two separate takings of this property, holding instead that the taking occurred when the owner had been deprived of the use of the property through the Government's possession of it,

and not when the Government later obtained formal title to the property. Applying this principle, *Caldwell* said that in the context of a rails-to-trails conversion, it did not matter that the property taken through the issuance of a NITU might subsequently be abandoned, because "the government's decision to abandon the taking 'merely results in an alteration to the property interest taken—from full ownership to one of temporary use and occupation.'" *Caldwell*, at 1235.

This reasoning leads to a conclusion that the second NITU relating to the Sunflower Trail did not give rise a claim separate and distinct from any claim triggered by the first NITU. The first NITU was the finite start of plaintiffs' claim that the defendant took the property by halting abandonment and the vesting of reversionary interests. The issuance of the second NITU allowed for a further extension of the negotiating period, and it allowed the railroad to negotiate with a different trail operator, but the plaintiffs had already been deprived of the use of their property (assuming their allegations to be true) as of the issuance of the first NITU. The second NITU merely continued in effect the blocking of the reversionary interests begun by the first NITU. There is no allegation that the second NITU involved the taking of some greater portion of the right-of-way not covered by the first NITU, or that there was some type of intervening event that would permit the second NITU to be viewed a separate taking of the property. *Cf. Id.* at 1235 (noting that abandonment of the property after issuance of a NITU may alter the nature of the taking from full ownership to temporary use, but does not give rise to a separate takings claim). As such, the court finds that plaintiffs' claims relating to the Sunflower Trail are barred by the statute of limitations in 28 U.S.C. § 2401(a).

3. *The Flint Hills Nature Trail.* The Flint Hills Nature Trail conversion involved a series of NITUs. The first NITU, relating to the 37.83 miles of rail line identified in ¶ 22 of the Complaint, was issued by the STB on October 31, 1994. A second NITU, which applied to the 26.57 miles of rail line identified in ¶ 23 of the Complaint, was issued on March 31, 1995. These NITUs imposed interim trail use conditions and authorized the Missouri Pacific (MP) to negotiate a trail agreement with the Rails–to–Trails Conservancy (RTC). On December 18, 1995, MP notified the STB that it had conveyed its entire Hoisington Subdivision, including the two portions mentioned above, to the RTC under the Trails Act.

On March 1, 1996, after RTC conveyed the Hoisington Subdivision to Seranta, the STB reissued NITUs that vacated the previously issued ones and substituted Seranta as the new trial user. On July 21, 1997, after ownership and management was transferred by Seranta to the Kansas Horseman Foundation (KHF), the STB again vacated the prior NITUs and issued new ones substituting KHF for Seranta as the interim trail manager.

Although the procedure involving this particular trial was somewhat complicated, under the rule announced in *Caldwell* it was the issuance of the first set of NITU's, which prevented the rights-of-way from reverting to plaintiffs' property, that constitutes the triggering event for any taking claim under the facts alleged. The mere extension of a NITU negotiating period or the vacating of one NITU by another in order to substitute the designated trail operator could not amount to a separate taking of the property triggering a new claim under the facts alleged by the plaintiffs. Under these facts, the issuance of the first two NITUs—on October 31, 1994, and March 31, 1995—gave rise to any cause of action plaintiffs had for the taking of their property. Under the counting

rules noted above, the six-year limitation period on any such claim expired before the filing of the complaint in this action. Accordingly, the court concludes that the plaintiffs' claims relating to the Flint Hills Nature Trail are barred by the statute of limitations in 28 U.S.C. § 2401(a).

### VI. *Conclusion.*

The court concludes that all of the claims alleged by plaintiffs are barred by the statute of limitations in 28 U.S.C. § 2401(a). Accordingly, defendant United States' motion to dismiss the complaint (Doc. 9) is GRANTED for failure to state a claim upon which relief can be granted, and the action is hereby dismissed on the merits. The clerk is directed to enter judgment accordingly.