PLAGER, Senior Circuit Judge.
 

 This is a takings case, in which the triggering event — the 1951 Treaty of Peace between the United States and Japan (known as the San Francisco Treaty) that formally ended World War II in the Pacific Theater — occurred more than fifty years ago'. Plaintiffs purport to represent a class of 400,000 to 600,000 United States citizens injured or killed as a result of Japan’s war against the United States; plaintiffs’ prayer for relief seeks damages against the United States in the amount of $1 trillion.
 
 [1]
 

 
 *1203
 
 It is plaintiffs’ claim that, by barring individual claims against Japan for personal wrongs done to them, the Treaty took their property, and that the taking of their property is in violation of the United States Constitutional requirement that “private property [shall not] be taken for public use without just compensation.”
 
 [2]
 

 Plaintiffs recognize that they have a problem with the statute of limitations, which bars suits against the United States in the Court of Federal Claims that are brought more than six years after the cause of action accrues. 28 U.S.C. § 2501. They offer two novel theories why the statute of limitations does not bar their cause of action: one is that since takings claims are constitutionally enabled, Congress does not have the power to limit a claimant’s right of recovery; and the second is that until the United States announces in no uncertain terms its intention not to pay for the taking, a cause of action does not begin to accrue for limitations purposes.
 

 The trial court was not persuaded by plaintiffs theories, and granted the Government’s motion to dismiss on the ground that the suit was barred by the statute of limitations. This appeal followed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).
 

 I. BACKGROUND
 

 The relevant facts can be briefly stated. On September 8, 1951, the United States and over forty Allied nations signed a Treaty of Peace with Japan. The Treaty was ratified by the Senate on March 20, 1952, and it entered into force on April 28, 1952.
 

 The Treaty was a comprehensive settlement of all issues arising between Japan and the Allied nations concerning the war. As part of the settlement, the Allied nations, including the United States, agreed to seize certain assets of Japan in their various territories, and to waive all claims for themselves and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war. Treaty of Peace with Japan, Sept. 8, 1951, art. 14, 3 U.S.T. 3169, 3180-83. Each Allied power would then make its own arrangements for compensation of its nationals for injuries attributable to the war.
 

 In the United States, Congress created a War Claims Fund and made payments to American victims of the war. 50 U.S.C. app. § 2012. This included compensation for civilians as well as military personnel who were mistreated during captivity. Plaintiffs are two individuals who fall into that category. Plaintiff Gilbert Hair was an infant in 1942 when he and his mother were interned by the Japanese in the Philippines; plaintiff Ethel Millett was a member of the U.S. Army who was captured by the Japanese and also interned. Both allege that they were mistreated by their captors, and that they represent a large number of other individuals similarly situated. As noted, on behalf of the class they ask for $1 trillion in compensation from the United States for the causes of action that were taken from them by the Treaty.
 

 Plaintiffs filed their complaint on September 12, 2001, just short of fifty years after the Treaty of Peace went into effect. The United States moved to dismiss on the ground that the action was barred by the six-year statute of limitations provided in 28 U.S.C. § 2501.
 
 [3]
 
 The trial court granted the motion, and plaintiffs appealed.
 

 
 *1204
 
 II. DISCUSSION
 

 Whatever may have been the injustices visited upon these plaintiffs, first by the forces of Japan and, arguably, later by a home government whose expression of gratitude in dollar terms is thought to be less than adequate, the narrow issue presented in this appeal is whether plaintiffs’ suit against the United States, based on the 1951 Treaty provisions, is barred by the statute of limitations. For purposes of the government’s motion to dismiss, we must assume that plaintiffs’ well-pleaded allegations of fact are true. Additionally, although we are not required to do so, for purposes of evaluating whether the statute of limitations bars plaintiffs’ claim here, we will accept plaintiffs’ legal conclusion that the act of the United States in effectively barring its nationals from suing Japan for wrongs committed against them individually constituted a taking of their private causes of action for a public purpose or use without just compensation, in violation of the Fifth Amendment.
 

 Whether the United States might have other defenses for such an act deriving from its powers as a nation-state is not before us. The sole issue on appeal is whether the six-year statute of limitations bars these plaintiffs from recovering against the United States for the alleged wrong: if the statute applies to bar causes of action such as this one that are not brought until after six years from its accrual, and if the entry into force of the treaty in 1952 is the event that violated plaintiffs' rights and marks the accrual of the cause of action, then plaintiffs had until 1958 to bring the present action or be forever barred.
 

 A. The Constitution and the
 
 Statute of
 
 Limitations
 

 Plaintiffs’ first argument for avoiding the impact of the six-year statute on their cause of action is that their claim is constitutionally based, and therefore it is unconstitutional to deprive them of their constitutional right, short of a full and fan-decision on the merits. Since the right to compensation for a governmental taking of private property is constitutionally protected, the argument is stunning in its potential — it would have the effect of leaving all takings claims against the United States without a termination, except by ultimate resolution in the courts.
 

 It has been the common understanding that wrongs for which the law grants a remedy are subject to a requirement that, in fairness, the party wronged must pursue the remedy in a timely fashion.
 
 [4]
 
 See
 
 generally Developments in the Law: Statutes of Limitations,
 
 63 Harv. L.Rev. 1177, 1185 (1950). The concern is for stale claims, when witnesses and records are missing, and memories have faded. There is also the concern for repose— after some period of time, claims should not continue to hang about, unresolved. The thought is that a plaintiff cannot sleep on his or her rights, and then suddenly demand a remedy, without creating a greater wrong against the party charged, and a wrong against the peace of the community.
 

 In
 
 Board of Regents v. Tomanio,
 
 446 U.S. 478, 487, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980), the Supreme Court said:
 

 
 *1205
 
 Statutes of limitations are not simply technicalities. On the contrary, they have long been respected as fundamental to a well-ordered judicial system. Making out the substantive elements of a claim for relief involves a process of pleading, discovery, and trial. The process of discovery and trial which results in the finding of ultimate facts for or against the plaintiff by the judge or jury is obviously more reliable if the witness or testimony in question is relatively fresh. Thus in the judgment of most legislatures and courts, there comes a point at which the delay of a plaintiff in asserting a claim is sufficiently likely either to impair the accuracy of the fact-finding process or to upset settled expectations that a substantive claim will be barred without respect to whether it is meritorious.
 

 Legislatures enact statutes of limitations tailoring the time period to what is thought appropriate to the nature of the cause of action.
 
 See, e.g.,
 
 28 U.S.C. § 2401(b) (two years for claims under the Federal Tort Claims Act); 26 U.S.C. § 6511 (for tax refund suits, three years from time tax return was filed or two years from time tax was paid, whichever expires later); 15 U.S.C. § 15b (four years for private antitrust suits under the Clayton Act). Even without a specific statutory bar to call into play, courts will impose a parallel bar — -under the rubric of lach-es — in cases in which the plaintiff has failed to act in a reasonably prudent manner to protect and enforce rights, and when a perceived injustice to the defendant exists.
 
 See, e.g., AC. Aukerman Co. v. R.L. Chaides Constr. Co.,
 
 960 F.2d 1020 (Fed.Cir.1992) (en banc) (patent infringement claim may be barred under the doctrine of laches).
 

 Does the fact that the right sought to be enforced has its origin in the Constitution, rather than in a statutory grant, mean that there should be no limits imposed on its enforcement, either by legislature or courts? Plaintiffs so argue. They begin by drawing a distinction between what they call “common-law takings” and -“eminent-domain takings.” Common-law takings, according to plaintiffs, include takings that arise from torts (non-contract wrongs) and contract wrongs; the eminent-domain takings are government actions that occupy (or today, regulate) private property. Plaintiffs posit that the former are subject to sovereign immunity doctrines, the latter are not.
 

 Sovereign immunity is the immunity that, by the accident of English history that underlies American law, shields the government, absent consent to be sued, from legal liability for all sorts of wrongs, including torts and contract wrongs. Based on the distinction between common-law takings and eminent-domain takings, plaintiffs conclude, that the bar of the statute of limitations properly applies only to cases involving the government’s waiver of sovereign immunity, the common-law takings cases.
 

 It is true that sovereign immunity does not protect the government from a Fifth Amendment Takings claim because the constitutional mandate is “self-executing.”
 
 See United States v. Clarke,
 
 445 U.S. 253, 257, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980);
 
 Hendler v. United States,
 
 952 F.2d 1364, 1371 (Fed.Cir.1991). Therefore, ask the plaintiffs, if Congress lacks the constitutional power to take private property without paying for it, how can it suddenly get the power after six years or any other designated period of elapsed time? The correct answer, we are told, must be that an eminent-domain taking cannot be foreclosed except by a judicial proceeding on the merits.
 

 
 *1206
 
 There are several flaws in plaintiffs’ argument. First is that the premise on which it is based is wrong. Second is the absence of any law in support of the theory — plaintiffs do not favor us with any citation to authority that supports their view of the law, something of which courts do have a fondness — though its absence here may be because the available authority is to the contrary.
 

 First, the premise. The hypothesized distinction between “common-law” takings and “eminent-domain takings” is a verbal joust without substance. The fundamental idea that there is a right for every wrong, the jurisprudential basis for torts and contract wrongs, arises from early common law decisions.
 
 See
 
 3 William Blackstone,
 
 Commentaries
 
 *23, *109. Its application is universal, in the sense that such wrongs can be committed by private parties as' well as by governments, although governments may be able to escape their duty to pay by hiding behind the sovereign immunity doctrine. The presence or absence of sovereign immunity in a case is simply an attribute of government, not an inherent characteristic of a cause of action.
 

 The constitutional constraint on government’s power to take private property, on the other hand, arose from the historic power of the English sovereign to seize private property for governmental purposes, with or without the consent of the property owner, and with or without compensation. The salutary inclusion in the list of limitations on government contained in the Fifth Amendment to our Constitution that prohibits the taking of private property without just compensation was a response to the claim of the English kings that sovereign rights prevailed over private property rights. The Founders thought otherwise — though they recognized the necessity for government to be able to take private property for governmental purposes,
 
 see The Federalist No. 10
 
 (James Madison), that power could be exercised only by making the private property owner whole. Thus the distinction plaintiffs attempt to draw is unavailing. Analytically, whether common law-based tort and contract law is subject to statutes of limitations, with or without sovereign immunity in the case of suits against the government, is unrelated to the question of whether constitutionally based takings claims may be made subject to such statutes.
 
 [5]
 

 Which leads to the question of the applicable law. This court hears a goodly number of takings cases. In some the plaintiff property owner prevails.
 
 See, e.g., Cienega Gardens v. United States,
 
 331 F.3d 1319 (Fed. Cir.2003) (holding that statutory abrogation of low-income housing owners’ contract rights was a taking);
 
 Palm Beach Isles Assocs. v. United States,
 
 231 F.3d 1354 (Fed.Cir.2000) (holding that permit denial constituted a categorical taking);
 
 McKay v. United States,
 
 199 F.3d 1376 (Fed.Cir.1999) (holding that Government placement of groundwater monitoring wells was a taking);
 
 Preseault v. United States,
 
 100 F.3d 1525 (Fed.Cir.1996) (en banc) (holding that Government’s lease of former railroad easement to state for conversion to trail was a taking);
 
 Brown v. United States,
 
 73 F.3d 1100 (Fed.Cir.1996) (holding that overflights can constitute a taking);
 
 Loveladies Harbor, Inc. v. United States,
 
 28 F.3d 1171 (Fed.Cir.1994) (holding that denial of permit under section 404 of the Clean Water Act was a taking);
 
 Florida Rock Indus., Inc. v. United States,
 
 18 F.3d 1560 (Fed.Cir.1994) (remanding for determination of partial taking);
 
 Hendler v. United States,
 
 952 F.2d 1364. (Fed.
 
 *1207
 
 Cir.1991) (holding that Government placement of groundwater monitoring wells was a taking).
 

 In others, the Government is held not to be hable.
 
 See, e.g., Walcek v. United States,
 
 303 F.3d 1349 (Fed.Cir.2002) (holding that denial of development on certain wetlands was not a taking);
 
 Brubaker Amusement Co. v. United States,
 
 304 F.3d 1349 (Fed.Cir.2002) (holding that unenforced tobacco regulations did not constitute a taking of vending machine owners’ contracts);
 
 Conti v. United States,
 
 291 F.3d 1334 (Fed.Cir.2002) (holding that regulatory ban on drift gillnet fishing was not a taking of fishing vessel and gear);
 
 Avenal v. United States,
 
 100 F.3d 933 (Fed. Cir.1996) (holding that Government freshwater diversion project was not a taking of leased water-bottom lands used for oyster propagation);
 
 Kunkes v. United States,
 
 78 F.3d 1549 (Fed.Cir.1996) (holding that requirement that fee be paid to preserve unpatented mining claims was not a taking).
 

 Whenever the facts permit, counsel for the Government invoke the statute of limitations as a bar to a takings suit, and thus as a way to avoid addressing the merits. We have decided several cases in which the six-year statute of limitations was raised as a bar to a claim of a constitutional taking.
 

 In
 
 Bayou des Families Development Corp. v. United States,
 
 130 F.3d 1034 (Fed.Cir.1997), plaintiff alleged that the denial by the United States of a permit to build a levee effected a taking of its property without just compensation in violation of the Fifth Amendment. The issue on appeal was whether all elements of a cause of action accrued in the plaintiffs hands more than six years before plaintiff filed suit. Beginning in 1975 and terminating when suit was filed in 1991, the case had a long history of permit filings, permit denials, more filings, more denials, ■ interspersed with occasional state and federal lawsuits of one kind or another. The trial court, at the behest of the Government, held that plaintiffs cause of action accrued with the first permit denial in 1979, and that it therefore failed to file suit within the time allowed by the six-year statute of limitations. After thorough review of the record, we concluded that plaintiffs cause of action may have accrued in 1979, but certainly no later than 1982, the date of a federal district court judgment upholding the denial of a permit. We affirmed the trial court’s dismissal of the suit against the Government; no question was raised regarding the applicability of the statute of limitations to constitutional takings claims.
 

 Similarly, in
 
 Boling v. United States,
 
 220 F.3d 1365 (Fed.Cir.2000), the question was when does a cause of action against the United States accrue when it is based on a history of waterfront erosion as a result of a Corps of Engineers project. The trial court thought it accrued once any small portion of the property had suffered erosion damage, and gave judgment for the Government. We held that that was too rigid a test, and that the proper test was when sufficient inroads into the property had occurred so that the permanent nature of the taking was evident and the extent of the damage foreseeable. The case was remanded for further proceedings; and again, no question was raised by either party about the applicability of the statute of limitations to constitutional takings claims.
 

 Perhaps the reason the applicability of the statute of limitations to constitutionally based causes of action has not been challenged is because the Supreme Court addressed the issue in
 
 Block v. North Dakota,
 
 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). .In that case, the issues on appeal related to a dispute be
 
 *1208
 
 tween North Dakota and the United States over ownership of certain portions of a riverbed within the state. After concluding that the federal Quiet Title Act of 1972 was the exclusive vehicle for resolution of the title dispute, the Court addressed the question of whether the Act’s twelve-year statute of limitations applied to a state. North Dakota argued that the statutory time bar was not intended to apply to states, and if it did, it was unconstitutional under the equal footing doctrine and the Tenth Amendment.
 
 [6]
 
 The Court held that Congress intended that the statutory bar apply to all litigants utilizing the Act and stated: “A constitutional claim can become time-barred just as any other claim can. Nothing in the Constitution requires otherwise.”
 
 Id.
 
 at 292, 103 S.Ct. 1811 (citations omitted);
 
 see also Stone Container Corp. v. United States,
 
 229 F.3d 1345, 1350 (Fed.Cir.2000) (applying a two-year statute of limitations to tax refund claims: “Both the Supreme Court and this court have repeatedly held that the federal government may apply statutes of limitations to just compensation claims.”).
 

 We conclude that there is no merit to plaintiffs argument that the constitutional right to just compensation is absolute, any more than any other right is absolute. The remedy afforded by the Fifth Amendment is subject to a reasonable time bar designed to protect other important societal values.
 

 B. Notice and the Statute of Limitations
 

 Plaintiffs second theory for avoiding the bar of the statute is that “a statute of limitations could begin to run in the context of an eminent-domain taking only upon the clear announcement by the government of a refusal to pay compensation.” Appellants’ Br. at 11. Again, plaintiffs do not offer any authority squarely, or even remotely, on point, and again their theory is flawed both as a theory and as a proposition of law.
 

 The basic rule is that the clock of a statute of limitations begins to run from the date the plaintiffs cause of action “accrues”; that is the term typically found in the statutes. See,
 
 e.g.,
 
 28 U.S.C. § 2501; 1 Corman,
 
 supra,
 
 § 7.4.1. The clock stops on the date that the plaintiff files his complaint in a court of proper jurisdiction. A cause of action “accrues” when the plaintiff has a complete and present cause of action. 1 Corman,
 
 supra,
 
 § 6.1. “The earliest opportunity for a complete and present cause of action is that moment when the plaintiff has suffered a legally recognizable harm at the hands of the defendant, such as the time of contract breach or the commission of a tortious wrong.”
 
 Id.
 

 In most instances the legal wrong and the resulting injury occur simultaneously, and the plaintiff is, or reasonably should be, aware of the wrong and its cause. In certain instances, such as fraudulent concealment by the defendant of the causal event, or when plaintiff is led to rely on the defendant because of a fiduciary relationship, plaintiff can claim an absence of reasonable notice that the cause of action existed.
 
 See
 
 2
 
 id.
 
 §§ 9.7, 9.10. Otherwise, as a general proposition, absent a statutory requirement that defendant give notice of a particular action before a cause of action based on that action can accrue,
 
 [7]
 
 a specific alert by the defendant has never been a requirement.
 

 
 *1209
 
 Plaintiffs argue for creating such a requirement on the ground that without such a governmental statement of intention not to pay just compensation, property owners cannot know that the government may have secretly decided upon a course of unlawful confiscation. Appellants’ Br. at 11-12. As the Government indicates in its brief, however, plaintiffs’ theory presupposes that the government acknowledges that a taking has occurred, but plans to provide no compensation. Appellee’s Br. at 15. That argument reflects a certain naiveté about governmental conduct. When the government decides to acquire property — typically real estate — that the owner does not wish to sell, the exercise of eminent domain generally is conducted publicly through court action, sometimes administratively, and just compensation is determined and paid.
 
 See
 
 6 Julius L. Sackman,
 
 Nichols on Eminent Domain
 
 §§ 24.04, 24.05 (rev.3d ed.2003). No “taking” case as we typically see them arises, since the taking is a foregone conclusion;
 
 [8]
 
 if there is an appeal, it is over what compensation is just.
 

 The “takings” cases that arise in modern takings jurisprudence arise when a government action inadvertently or deliberately impinges on private rights, with no advance public pronouncement that a taking is intended. The inadvertent eases can arise from various activities such as beach reconstruction, airplane overflights, or adoption of permitting and fee requirements; the deliberate cases may be caused by regulations designed to limit private rights, particularly development rights, or, as in this case, by extinguishing such rights.
 
 See
 
 cases cited in II.A,
 
 supra.
 

 In these cases, the government denies liability, arguing that whatever the cause of loss to the plaintiff resulting from the government’s action, it does not rise to the level of a “taking” for which the Constitution mandates payment. Clearly the government had no intention to pay for its actions. Plaintiffs argue that if the government at anytime in 1952 or in the years that followed came to the conclusion that it would not comply with the Just Compensation clause, it had at the very least a constitutional obligation to make a public announcement to that effect. Appellants’ Br. at 13. First of all, there is no such constitutional obligation. Secondly, as just discussed, a plaintiff has no reasonable expectation that the government will make such a public announcement, since the government as a matter of practice routinely denies liability. And thirdly, the government, by undertaking to recompense injured citizens through the War Claims Fund pursuant to its Treaty obligations, left little doubt about its intentions regarding war claims against Japan.
 

 Plaintiffs’ argument, if successful, could become a sword against claimants, as well as the contended-for shield. Assume plaintiffs’ argument: no cause of action against the government for a taking could accrue until the government gave express notice of its intention not to pay. Could the simple expedient of governmental silence for an indefinite period, perhaps forever, frustrate a claimant’s right to sue for a taking, as no cause of action would ever accrue?
 

 We find no merit to the proposition that the government was obligated to make such a public pronouncement of its intentions not to pay for taking these plaintiffs’ causes of action as a precondition to the accrual of their causes of action.
 

 
 *1210
 
 C. Policy Issues
 

 Plaintiffs conclude their case by presenting several policy-type arguments for why they must succeed. These can be dealt with summarily.
 

 Plaintiffs argue that “the legal repercussions of allowing the government for the first time in American history to confíscate private property and get away with it, are that the confiscation will as a matter of law be frozen into the citable holding of this case as legal precedent.” Appellants’ Br. at 16. But that argument can be made by any plaintiff whose property rights have been, at least in plaintiffs eyes, destroyed without just compensation. Every plaintiff who loses a takings case — and we cite a number, above — believes the property was confiscated without just compensation, else the plaintiff would not have brought the suit. This argument, then, is no more than the loser’s lament, and hardly a basis for establishing policy.
 

 In a related argument, plaintiffs propound that this case is the first time in American history, so far as the plaintiffs are aware, that the government of the United States has taken private property for a public use and refused to pay for it.
 
 Id.
 
 It is regrettable that plaintiffs’ awareness is so limited. Anytime the government successfully invokes the statute of limitations to bar an otherwise meritorious takings claim,
 
 see, e.g.,
 
 cases cited in II.A,
 
 supra,
 
 the government ends up taking private property without just compensation. Plaintiffs further posit that “the tacit assumption ... has been that the government would not deliberately act contrary to the Takings Clause.” Appellants’ Br. at 18. If that were true, there rarely would be need for takings litigation, or for an Executive Order requiring administrative agencies to examine regulatory proposals for their takings effects.
 
 See
 
 Exec. Order No. 12,630, 53 Fed.Reg. 8859 (Mar. 15, 1988). The reality of governmental behavior, at both the state and federal levels, is that the courts are called upon to constrain governmental conduct and to require compliance with Constitutional mandates such as the Fifth Amendment; the need for that role is self-evident from the filings in this court.
 

 We have considered the other arguments made by plaintiffs, and find them equally unpersuasive.
 

 III. CONCLUSION
 

 For the reasons stated, the judgment of the Court of Federal Claims is
 

 AFFIRMED.
 

 [1]
 

 . The trial court stayed class certification pending the resolution of the motions before it, and subsequently, in view of its disposition
 
 *1203
 
 of the case, ruled that the class certification issue was moot.
 

 [2]
 

 . U.S. Const, amend. V.
 

 [3]
 

 . 28 U.S.C. § 2501 provides in relevant part: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed
 
 *1204
 
 within six years after such claim first accrues.''
 

 [4]
 

 . A statute of limitations provides a bar to lawsuits that are not commenced within the applicable period; they do not preclude other assertions of the underlying substantive right, such as through counterclaims or offsets.
 
 See
 
 1 Calvin W. Corman,
 
 Limitation of Actions
 
 § 2.3.2 (1991).
 

 [5]
 

 . Plaintiffs in their reply brief seem to distance themselves from their earlier insistence on the "common-law" v. "eminent-domain" labels. Appellants' Reply Br. at 3, n. 1.
 

 [6]
 

 . "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.” U.S. Const. amend. X.
 

 [7]
 

 .
 
 See
 
 1 Corman,
 
 supra,
 
 § 6.5, for a discussion of such statutes.
 

 [8]
 

 . Ever since the case of
 
 Berman v. Parker,
 
 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), the question of whether a taking is for a public purpose has largely disappeared from the cases, though it remains an important question.