# United States Court of Appeals for the Federal Circuit

05-1255

JOHN BARCLAY, CONSTANCE BARCLAY, ROYER BARCLAY, ALTHEA BARCLAY, JOHN AMOS, MARCIA J. BACON, RONALD J. BARTEL, MELVIN BERGEN, JOHN E. BOYLE, JONATHAN EHRLICH, FLORENCE EHRLICH, DONALD GRAUMANN, RUBEN KLIEWER, ALVIN KROUPA, BARBARA KROUPA, BURDETT LEDELL, LEE DALE MILLER, VERNON MINNS, FRANK A. MITCHELL, MID KANSAS COOPERATIVE ASSOCIATION, JOHN F. OPAT, ROBERT PRESNELL, JANET REGIER, SONJA REGIER, DON REINHARDT, JANICE REINHARDT, MARY J. RODGERS, DARRELL THOMPSON, ROBERT TURNER, GENEVA TURNQUIST, DONALD TURNQUIST, CLARK E. WIEBE, and MARLENE J. WEBER,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

05-5109

RENEWAL BODY WORKS, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Cecilia Fex, Ackerson Kauffman Fex, PC, of Washington, DC, argued for plaintiffs-appellants John Barclay, et al. With her on the brief was Nels Ackerson.

Robert J. Rosati, of Fresno, California, argued for plaintiff-appellant Renewal Body Works, Inc.

Lane M. McFadden, Attorney, Appellate Section, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee in 05-1255. With him on the brief were Kelly A. Johnson, Acting Assistant Attorney General, and Kathryn E. Kovacs and John E. Arbab, Attorneys. John E. Arbab, Attorney, argued for defendant-appellee in 05-5109. With him on the brief were Kelly A. Johnson, Acting Assistant Attorney General, and Kathryn E. Kovacs, Attorney.

Mark F. (Thor) Hearne II, Lathrop & Gage L.C., of St. Louis, Missouri, for amici curiae Sarah Illig, et al. in appeal 05-1255. With him on the brief were J. Robert Sears and Alok Ahuja. Of counsel on the brief were Charles J. Cooper, David H. Thompson, and David M. Lehn, Cooper & Kirk, PLLC, of Washington, DC.

05-1255 appealed from: United States District Court for the District of Kansas
Senior Judge Wesley E. Brown

05-5109 appealed from: United States Court of Federal Claims
Judge George W. Miller

# United States Court of Appeals for the Federal Circuit

05-1255

JOHN BARCLAY, CONSTANCE BARCLAY, ROYER BARCLAY, ALTHEA BARCLAY,
JOHN AMOS, MARCIA J. BACON, RONALD J. BARTEL, MELVIN BERGEN,
JOHN E. BOYLE, JONATHAN EHRLICH, FLORENCE EHRLICH,
DONALD GRAUMANN, RUBEN KLIEWER, ALVIN KROUPA, BARBARA KROUPA,
BURDETT LEDELL, LEE DALE MILLER, VERNON MINNS, FRANK A. MITCHELL,
MID KANSAS COOPERATIVE ASSOCIATION, JOHN F. OPAT, ROBERT PRESNELL,
JANET REGIER, SONJA REGIER, DON REINHARDT, JANICE REINHARDT,
MARY J. RODGERS, DARRELL THOMPSON, ROBERT TURNER,
GENEVA TURNQUIST, DONALD TURNQUIST, CLARK E. WIEBE,
and MARLENE J. WEBER,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

05-5109

RENEWAL BODY WORKS, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED: April 11, 2006

_____

Before NEWMAN, DYK, and PROST, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK. Dissenting opinion filed by Circuit
Judge NEWMAN.

The United States District Court for the District of Kansas and the Court of Federal Claims dismissed several landowners' Fifth Amendment takings claims challenging the operation of the National Trail Systems Act (the "Trails Act"), 16 U.S.C. § 1247(d). Barclay, et al. v. United States, 351 F. Supp. 2d 1169 (D. Kan. 2004); Renewal Body Works, Inc. v. United States, 64 Fed. Cl. 609 (2005). Applying our decision in Caldwell v. United States, 391 F.3d 1226 (Fed. Cir. 2004), cert. denied 126 S. Ct. 366 (2005) (mem.), both the district court and the Court of Federal Claims held that the claims were time-barred because they were filed more than six years after the Surface Transportation Board ("STB") issued the Notices of Interim Trail Use or Abandonment ("NITU"). We agree that Caldwell governs, and we affirm.

BACKGROUND

I

By 1990, the nation's interstate railway system had shrunk from its peak of 272,000 miles of track in 1920 to about 141,000 miles of track, and railroads continue abandoning track each year. Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 5 (1990) ("Preseault I"). As the Supreme Court explained in Preseault I, the purpose of the Trails Act was to preserve unused railroad rights-of-way by converting them into recreational trails. Id. The mechanism is a STB order (a NITU) staying railroad abandonment during the pendency of trail use.

As described in detail in Preseault I, 494 U.S. at 7-8, Preseault v. United States, 100 F.3d 1525, 1537-40 (Fed. Cir. 1996) (en banc) ("Preseault II"), and Caldwell, 391 F.3d at 1228-30, in order to abandon a line that is subject to STB jurisdiction, a railroad must apply to the STB under either 49 U.S.C. § 10903 (standard abandonment), or 49

U.S.C. § 10502 (abandonment by exemption).[1]  All proceedings involved in these appeals were exemption proceedings.  Under the Trails Act, the STB may issue a NITU, suspending exemption proceedings for 180 days to allow a third party to enter into an agreement with the railroad to use the right-of-way as a recreational trail.  49 C.F.R. § 1152.29(b)(2) and (d) (2005).  If the railroad and the trail operator reach an agreement, "the NITU extends indefinitely to permit interim trail use . . . ."  Caldwell, 391 F.3d at 1230; see 49 C.F.R. § 1152.29(d)(1).  If no trail use agreement is reached, the NITU converts into an effective notice of exemption, allowing the railroad to "abandon the line entirely and liquidate its interest."  Preseault I, 494 U.S. at 7; see Caldwell, 391 F.3d at 1230.  While it retains jurisdiction over the right-of-way, the STB may reopen exemption proceedings to substitute a new trail operator, 49 C.F.R. § 1152.29(f), to accept late-filed trail use requests, 49 C.F.R. § 1152.29(e)(1), or to vacate a notice of exemption and issue a NITU when a railroad late files its statement of willingness to negotiate, 49 C.F.R. § 1152.29(g).

In Preseault I, the Court noted but did not resolve the claim that "Congress . . . violated the Fifth Amendment by precluding reversion of state property interests."  494 U.S. at 9; see also id. at 22 (O'Connor, J., concurring) (operation of the Trails Act "may delay property owners' enjoyment of their reversionary interests," which "burdens and defeats the property interest").  In Preseault II, we established that the elimination of adjacent landowners' state law reversionary interests when abandonment is suspended under the Trails Act constitutes a Fifth Amendment taking.  100 F.3d at 1550-52.  In

---

[1]  On January 1, 1996, the STB succeeded the Interstate Commerce Commission as the agency with authority to regulate the interstate rail system.  49 U.S.C. § 702 (2000).  We use "STB" to refer to both agencies.

<u>Caldwell</u>, we held that such a claim accrues for statute-of-limitations purposes when railroad abandonment proceedings are suspended by the STB's issuance of a NITU. <u>Caldwell</u>, 391 F.3d at 1235. The Barclay appellants (the appellants in No. 05-1255) and Renewal (the appellant in No. 05-5109) challenge both the correctness of the <u>Caldwell</u> decision and its applicability to the particular facts of their takings claims.

II

The Barclay appellants filed their Trails Act takings claims in the United States District Court for the District of Kansas on April 7, 2004. The complaint alleged that railroad rights-of-way running across the Barclay appellants' property in Kansas were converted into three different recreational trails (the Meadowlark, Sunflower, and Flint Hills trails) pursuant to the Trails Act, and that these conversions constituted Fifth Amendment takings. The government moved to dismiss on the ground that the complaint was not filed within the six year statute of limitations. We decided <u>Caldwell</u> while the government's motion was pending. Because the initial NITUs for all three trails were issued prior to the cutoff date for the statute of limitations,[2] the district court dismissed the complaint.

The district court found that the Supreme Court's decisions in <u>American Pipe & Construction Co. v. Utah</u>, 414 U.S. 538 (1974), and <u>Crown Cork & Seal Co., Inc. v. Parker</u>, 462 U.S. 345 (1983), required tolling the statue of limitations for eleven months, three weeks, and one day, during the pendency of <u>Swisher v. United States</u>, 189 F.R.D. 638 (D. Kan. 1999), a class action alleging Trails Act takings in which the Barclay

---

[2]    The relevant NITUs were issued on September 28, 1995 (Meadowlark trail), April 12, 1996 (Sunflower trail), and March 31, 1995, and May 24, 1996 (Flint Hills trail). As noted the complaint was filed on April 7, 2004.

appellants were class members. The district court nevertheless concluded that the action was not timely filed, applying our holding in Caldwell that the claims accrued on issuance of the original NITUs. The district court rejected contentions that replacement NITUs, rather than the initial NITUs, triggered the accrual of their claims for the Flint Hills and Sunflower trails, holding that subsequently issued NITUs covering the same rights of way "merely continued in effect the blocking of the reversionary interests begun by the first NITU" and "could not amount to a separate taking of the property triggering a new claim . . . ." Barclay, 351 F. Supp. 2d at 1179. The Barclay appellants timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(2).

III

Renewal's complaint in the Court of Federal Claims alleged that Trails-Act conversion of a railroad right-of-way running across Renewal's property in California constituted a taking. The STB authorized abandonment effective May 28, 1995, and the putative trail operator filed a trail use request on May 23, 1995. The railroad had removed most of the track and equipment by July 1995, though abandonment had not been consummated under federal law. The STB subsequently issued a NITU on October 23, 1995, and the right-of-way was converted into a trail.

Renewal filed its complaint in the Court of Federal Claims on December 11, 2003. The Court of Federal Claims dismissed the complaint, relying on Caldwell to conclude that "Renewal's claim accrued on October 23, 1995, the day the NITU was issued," well outside the six-year limitations period. Renewal, 64 Fed. Cl. at 615. Renewal timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

We review both the district court's dismissal for want of jurisdiction and the legal conclusions of the Court of Federal Claims without deference. <u>Lion Raisins, Inc. v. United States</u>, 416 F.3d 1356, 1362 (Fed. Cir. 2005); <u>Applegate v. United States</u>, 25 F.3d 1579, 1581 (Fed. Cir. 1994). We agree with the district court and the Court of Federal claims that these actions are time-barred under our decision in <u>Caldwell</u>.[3]

I

We explained in <u>Caldwell</u> that "[t]he taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." <u>Caldwell</u>, 391 F.3d at 1233. Abandonment is suspended and the reversionary interest is blocked "when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)" of the Trails Act. <u>Id.</u> We concluded that "[t]he issuance of the NITU is the only <u>government</u> action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way." <u>Id.</u> at 1233-34 (emphasis in original). Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU. We explicitly held in <u>Caldwell</u> that "[w]hile the taking may be abandoned . . . by the termination of the NITU[,] the accrual date of a single taking remains fixed." <u>Id.</u> at 1235. The issuance of the NITU is the only event that must

---

[3] Because we agree with the district court that the Barclay appellants' claims were time-barred even assuming that the <u>Swisher</u> action tolled the limitations period, we do not decide here whether the <u>Swisher</u> action required tolling.

occur to "entitle the plaintiff to institute an action." Creppel v. United States, 41 F.3d 627, 631 (Fed. Cir. 1994). Accrual is not delayed until a trail use agreement is executed or the trail operator takes physical possession of the right-of-way.

II

The Barclay appellants and Renewal first argue that Caldwell was wrongly decided and should be overruled. Panels of this court are bound by previous precedential decisions until overturned by the Supreme Court or by this court en banc. Kimberly-Clark Corp. v. Fort Howard Paper Co., 772 F.2d 860, 863 (Fed. Cir. 1985). The court declined to rehear Caldwell en banc, and the Supreme Court denied certiorari. Caldwell v. United States, 126 S. Ct. 366 (2005) (mem.). In any event, the majority of these arguments were rejected in Caldwell. To the extent that they are new, they are without merit.

The appellants and amicii contend that Caldwell was wrongly decided insofar as it relied on federal rather than state law to determine when abandonment and reversion of railroad rights-of-way occur.

Renewal argues that because the railroad had removed its track and equipment from the right-of-way by June 1995, effectively abandoning it under California law and granting Renewal "full and exclusive, undisturbed, and uncontested possession and use" of the property until trail use began, App. Br. of Renewal at 17, the issuance of the NITU in October, 1995 did not block Renewal's reversionary interest. Thus, Renewal concludes that its claim did not accrue until it was physically ousted from the property when trail use began.

While state law generally creates the property interest in a railroad right-of-way, Preseault I, 494 U.S. at 8, 16,[4] "the disposition of reversionary interests [is] subject . . . to the [STB's] 'exclusive and plenary' jurisdiction to regulate abandonments" of railroad rights of way. Id. at 8 (quoting Chi. & N. W. Transp. Co. v. Kalo Brick Y Tile Co., 450 U.S. 311, 321 (1981)). Federal law dictates when abandonment occurs. Thus, Renewal is incorrect that state law governs the timing of the abandonment. Abandonment cannot occur until authorized by federal law, and the NITU precludes abandonment and the reversion that would follow if abandonment were consummated. 16 U.S.C. § 1247(d) (2000); 49 C.F.R. § 1152.29(d)(1); Caldwell, 391 F.3d at 1229; Preseault v. Interstate Commerce Comm'n, 853 F.2d 145, 151 (2d Cir. 1988) ("Until the [STB] issues a certificate of abandonment, the railway property remains subject to the [STB's] jurisdiction, and state law may not cause a reverter of the property."); Nat'l Wildlife Fed'n v. Interstate Commerce Comm'n, 850 F.2d 694, 704 (D.C. Cir. 1988) ("Nor may state law cause a reverter of a right-of-way prior to an [STB]-approved abandonment."). Thus, there could be no abandonment until authorized by federal law. The NITU barred the abandonment; abandonment cannot occur after issuance of a NITU while the NITU is in effect. The barrier to reversion is the NITU, not physical ouster from possession. As Renewal itself admits, after issuance of the NITU, "the

_____

   [4]    In Toews v. United States, 376 F.3d 1371 (Fed. Cir. 2004), we reiterated that state law controls the basic issue of whether trail use is beyond the scope of the right-of-way. Id. at 1376-77. This merits question is distinct from the issue of claim accrual. See also Hash v. United States, 403 F.3d 1308, 1319-23 (Fed. Cir. 2005) (applying Idaho law to determine whether reversionary interests existed).

easement continued in existence beyond the time when it otherwise would have been abandoned." Reply Br. of Renewal, at 4. Thus, the NITU triggers accrual. [5]

The Barclay appellants' state law argument is also without merit. In the case of the Meadowlark trail, they insist that the NITU would not itself block a reversion if the railroad continued to use the right-of-way for railroad purposes after the NITU was issued. They argue that under Kansas law (which assertedly is different from California law), the taking can occur only after federal law authorized abandonment – that is, when the railroad ceases operations and the trail operator assumes physical possession. They thus urge that the trail operator's physical occupation, and not the Meadowlark trail NITU, blocked the reversion.[6] But even if under Kansas law the reversion would not occur until after federal authorization of abandonment, that state law reversion was still delayed by the issuance of the NITU, and the claim still accrued with the issuance of the NITU. It similarly makes no difference that railroad use may have continued after the NITU issued. The termination of railroad use was still delayed by the NITU.

III

The Barclay appellants also contend that <u>Caldwell</u> is distinguishable on a number of grounds.

A

The Barclay appellants argue that the original NITUs issued for the Flint Hills trail were vacated and that a second taking occurred when a new NITU was issued.

---

[5] Renewal also appears to argue that the railroad conferred rights on Renewal to use the right-of-way for parking during the period of railroad use, and that the conversion to trail use ousted Renewal from the right to use the right-of-way for parking. Whether or not this is correct, the alleged ouster was not a consequence of actions taken under the Trails Act.

[6] Amicii Sarah and Gale Illig also advance this same argument.

05-1255, 05-5109                      9

Although issuance of a NITU requires that at least one trail operator file a statement of willingness to assume responsibility for the trail before issuance of the NITU, and that trail operator is listed in the NITU, the ordering clause of a NITU is not typically limited to a particular trail operator[7] and a railroad is free to negotiate a trail use agreement with any party. See Rail Abandonments – Use of Rights-of-Way as Trails, Ex Parte No. 274 (Sub. No. 13), 2 I.C.C.2d 591, 605-06, 608, 1986 WL 68617 (1986) ("Rail Abandonments"); Neb. Trails Council v. Surface Transp. Bd., 120 F.3d 901, 906 (8th Cir. 1997); Goos v. Interstate Commerce Comm'n, 911 F.2d 1283, 1293 (8th Cir. 1990). Nonetheless, it is common that, if after issuance of the NITU the trail operator named in the original NITU becomes unwilling or unable to assume responsibility for the trail, a new operator will be able to be formally substituted by issuance of a new NITU before an agreement with the railroad is reached. It is also common for the original trail operator to become unwilling or unable to serve after an agreement is reached with the railroad, and for the original trail operator to propose to transfer trail use rights and responsibilities to a new trail operator. See Rail Abandonments, 2 I.C.C.2d at 606-08 (recognizing such "serial trail use" as appropriate).

The regulations provide a mechanism for substituting trail operators and updating NITUs without abandonment. The original and replacement trail operators file a notice

---

[7]    See, e.g., Cent. Kan. Ry., LLC – Abandonment Exemption – In Marion & McPherson Counties, KS, STB Docket No. AB-406 (Sub. No. 6X), 1996 WL 169774 (1996) (original Sunflower Trail NITU) (imposing no limitations on negotiating parties, referring only to "the trail user" in specifying the requirements for interim trail use); Mo. Pac. R.R. Co. – Abandonment Exemption – In Morris & Dickinson Counties, KS, STB Docket No. AB-3 (Sub. No. 121X), 1995 WL 137149 (1995) (Flint Hills trail, Dickinson Segment original NITU) (same); Union Pac. R.R. Co. – Abandonment Exemption – In McPherson County, KS, STB Docket No. AB-33 (Sub. No. 89X), 1995 WL 569357 (1995) (same).

in accordance with 49 C.F.R § 1152.29(f)(1).  Then, a new NITU (naming the new trail operator) is substituted for the original NITU (naming the original trail operator).  As the regulation provides, "[t]he board will reopen the abandonment or exemption proceeding, vacate the existing NITU or CITU; and issue an appropriate replacement NITU or CITU to the new trail user."  49 C.F.R. § 1152.29(f)(2).  There is no gap between the original and replacement NITUs.  Though formally "vacat[ing]" the original NITUs, the STB makes clear that, in substance, it is "substituting" trail users "in the [same] proceedings."[8]

Under these circumstances, we agree with the district court's conclusion that the series of STB NITU orders must be viewed as part of a single and continuous government action rather than as new takings.  Any other approach would result in multiple potential takings of the same reversionary interest.  In Caldwell, we rejected that approach, following United States v. Dow, 357 U.S. 17, 24 (1958), where the Supreme Court dismissed as "bizarre" the contention that there could be "two different 'takings' of the same property, with some incidents of the taking determined as of one date and some as of the other."  So long as abandonment was not consummated, the STB retained jurisdiction over the right-of-way.  See Baros v. Tex. Mexican Ry. Co., 400 F.3d 228, 236 (5th Cir. 2005); Birt v. Surface Transp. Bd., 90 F.3d 580, 585 (D.C. Cir. 1996).  Thus, any extensions or modifications of the original NITU were not separate potential takings.

---

[8]    See Mo. Pac. R.R. – Abandonment Exemption – In Osage, Lyon, & Morris Counties, KS, STB Docket No. Ab-3 (Sub. No. 111X), Mo. Pac. R. Co. – Abandonment Exemption – In Miami, Franklin, & Osage Counties, KS, STB Docket No. AB-3 (Sub. No. 115), Mo. Pac. R. Co. – Abandonment Exemption – In Morris & Dickinson Counties, KS, STB Docket No. AB-3 (Sub. No. 121X), 1997 WL 414314 (1997).

No different result is required for the Sunflower Trail NITU. The initial Sunflower Trail NITU was set to expire on June 6, 1997. Although a new trail operator filed a request to be substituted and for the issuance of a new NITU on June 6, the STB did not issue the NITU until 10 days later, on June 16, 1997. The Barclay appellants argue that under these circumstances the original NITU became inoperative, abandonment occurred, and the landowners' interest reverted. The replacement NITU in their view was a distinct government action that affected a new taking. Here again, however, the new NITU in substance merely extended the original NITU[9] and listed a new potential trail operator. Moreover, it is clear that the STB had authority to extend the NITU and that abandonment did not occur in the interim. See Birt, 90 F.3d at 585-87. In Birt, a landowner argued that the STB abused its discretion by retroactively extending a CITU (the version of the NITU issued in standard abandonment proceedings rather than exemption proceedings) eight days after the CITU expired. The District of Columbia Circuit disagreed, concluding that the STB retained jurisdiction over the right-of-way, and thus had authority to issue the extension, because the railroad did not consummate abandonment while the CITU was expired. Id. at 585-87. The new CITU became merely a continuation of the old. We agree with the District of Columbia Circuit's decision in Birt. Here, the railroad did not consummate abandonment of the Sunflower Trail right-of-way or file a notice of consummation with the STB between June 6, 1997,

---

[9]    Cent. Kan. Ry., LLC – Abandonment Exemption – In Marion & McPherson Counties, KS, STB Docket No. AB-406 (Sub. No. 6X), 1997 WL 323576 (1997) ("Upon reconsideration, the notice of exemption served . . . on March 13, 1996, exempting the abandonment of the line described above is modified to the extent necessary to implement interim trail use/rail banking . . . until December 13, 1997.").

the day the initial NITU expired, and June 16, 1997, the day the replacement NITU was issued.[10] Thus the new NITU was not a separate taking.

C

The Barclay appellants also insist that the Meadowlark Trail NITU did not block their reversionary interest because, unlike the NITU at issue in Caldwell, it contained a 180-day public use condition issued pursuant to 49 U.S.C. § 10905. The public use condition requires offering rights-of-way for sale to parties interested in using the property for, inter alia, "highways, other forms of mass transportation, conservation, energy production or transmission, or recreation." 49 U.S.C. § 10905 (2000). Here, at the time of the issuance of the NITU, a trail operator was named and the railroad had stated its willingness to negotiate a trail use agreement. The trail operator alternatively requested the issuance of the public use condition, apparently on the theory that a public use condition would preserve the right-of-way for trail use. In accordance with its policy, the STB issued both conditions simultaneously. The STB in the NITU made clear that the public use condition was "subject to the execution of a trail agreement," and that "[i]f an interim trail use/rail banking agreement is executed within the 180-day period specified above, the public use condition will expire to the extent the trail use/rail banking agreement covers the same line segment." Union Pac. R. Co. – Abandonment Exemption – In McPherson County, KS, STB Docket No. AB-33 (Sub. No. 89X), 1995

_____

[10]    As of December 24, 1996, the railroad must file a notice of consummation of abandonment with the STB within one year of the effective date of the notice of exemption permitting abandonment. 49 C.F.R. § 1152.29(e)(2); 61 Fed. Reg. 67876-01, 67896-97 (Dec. 24, 1996) (adding § 1152.29(e)(2)). The STB retains jurisdiction over the right-of-way until the notice of consummation is filed. See Baros, 400 F.3d at 236.

WL 569357, (1995) ("Meadowlark NITU").  No agreement was reached under the public use condition, and it expired after 180 days.

The Barclay appellants' theory appears to be that if the right-of-way were purchased under the public use condition for a use that was within the scope of the right-of-way, for example, continued rail use for mass transit, reversion might not have occurred under state law, and hence that the blockage of the reversion did not occur until the public use condition expired.

We do not think that Caldwell can be distinguished on this basis.  The primary object of the NITU was to preclude abandonment and thus to enable a trail use agreement.  But for the NITU's trail use condition, the railroad could abandon the line immediately and trigger the reversion, since the public use condition did not itself preclude abandonment.  See Fritsch v. Interstate Commerce Comm'n, 59 F.3d 248, 252 (D.C. Cir. 1995) (section 10906 precludes sale or other disposal of the right-of-way, but not abandonment); Nat'l Wildlife Fed'n, 850 F.2d at 701-02 (what is now section 10905 "has no rail banking provision that would preempt state laws that could otherwise result in reversion of rights-of-way to abutting landowners upon a cessation of rail service").  The bar on abandonment effected by the NITU's trail use condition triggered accrual of the cause of action here just as it did in Caldwell.

D

Finally, the Barclay appellants argue that their Sunflower Trail claims did not accrue when the initial NITU was issued on April 12, 1996, because after the replacement NITU was issued on June 16, 1997, a group of landowners petitioned to reopen the exemption proceeding and vacate both the initial NITU and the replacement

05-1255, 05-5109                    14

NITU.  The petitioners argued that the railroad omitted material facts in its notice of exemption and that CKC was financially unfit to serve as trail operator.  The STB denied the petition to reopen on December 18, 1998.  The petitioners appealed to the District of Columbia Circuit, which affirmed in part and reversed in part on October 22, 1999.  See Jost v. Surface Transp. Bd., 194 F.3d 79 (D.C. Cir. 1999).  On remand, the STB further explained its reasoning and again denied the petition on May 8, 2001.  That denial was not appealed.

The Barclay appellants contend that their claim did not accrue until the petition to reopen was finally denied on May 8, 2001, even though the original NITU as extended by the replacement NITU never ceased to be effective.  This is merely another version of the argument -- rejected in Caldwell -- that the original NITU should not be viewed as the taking because subsequent events might render the NITU only temporary.  The Sunflower Trail claims accrued when the original NITU issued, regardless of the petition to reopen.

IV

In summary, we adhere to Caldwell and hold that the issuance of the original NITU triggers the accrual of the cause of action.  The appellants' arguments in these cases urging a different trigger, depending on when abandonment occurred under state law, when the last NITU in a series was issued, or when the NITU was no longer subject to collateral attack, merely emphasize the correctness of the Caldwell rule.  Appellants' arguments lead potentially to multiple takings of a single reversionary interest and endless litigation concerning the appropriate date for accrual, thus leaving landowners and the government in a state of great uncertainty as to their respective rights and

obligations. Here, as in <u>Caldwell</u>, we conclude that takings law supplies a single bright-line rule for accrual that avoids these adverse consequences.

## CONCLUSION

The decisions of the district court and Court of Federal Claims dismissing the appellants' complaints are

## <u>AFFIRMED</u>.

## COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

05-1255

JOHN BARCLAY, CONSTANCE BARCLAY, ROYER BARCLAY, ALTHEA BARCLAY,
JOHN AMOS, MARCIA J. BACON, RONALD J. BARTEL, MELVIN BERGEN,
JOHN E. BOYLE, JONATHAN EHRLICH, FLORENCE EHRLICH,
DONALD GRAUMANN, RUBEN KLIEWER, ALVIN KROUPA, BARBARA KROUPA,
BURDETT LEDELL, LEE DALE MILLER, VERNON MINNS, FRANK A. MITCHELL,
MID KANSAS COOPERATIVE ASSOCIATION, JOHN F. OPAT, ROBERT
PRESNELL,JANET REGIER, SONJA REGIER, DON REINHARDT, JANICE REINHARDT,
MARY J. RODGERS, DARRELL THOMPSON, ROBERT TURNER,
GENEVA TURNQUIST, DONALD TURNQUIST, CLARK E. WIEBE,
and MARLENE J. WEBER,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

05-5109

RENEWAL BODY WORKS, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

NEWMAN, Circuit Judge, dissenting.

The panel majority holds that a Fifth Amendment taking occurs in a rails-to-trails case, and is actionable for compensation, on the date the government issues a Notice of Interim Trail Use or Abandonment ("NITU").  Such Notice announces the railroad's right to abandon railway use and negotiate with a potential trail operator.  If an agreement for

interim trail use is reached, the right-of-way is rail-banked for possible future railway use. 16 U.S.C. §1247(d). If such an agreement is not reached within 180 days, or an extension thereof, the right-of-way is deemed abandoned and any easements therefor are extinguished in accordance with the applicable state law. See Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 7 n.5 (1989) ("If agreement [for interim trail use with a qualified trail operator] is reached, interim trail use is thereby authorized. If not, the CITU or NITU automatically converts into an effective certificate or notice of abandonment."). Thus, the statute and the NITU do not make trail use mandatory, and if trail use is not achieved, the statute effects abandonment of railway use and reversion of the right-of-way easement.

A Fifth Amendment taking cannot occur simply upon issuance of a NITU, because the deprivation of the reversion has not yet occurred, and may never occur. If railway use is simply abandoned, the easement is extinguished, the property is unburdened, and no taking occurs. Thus the issuance of a Notice of Interim Trail Use or Abandonment is not a per se taking, and no right of compensation arises on issuance of the Notice. My colleagues err in holding that the period of limitations for Fifth Amendment compensation starts to accrue, and that an action can be brought, immediately upon issuance of the NITU. As explained in Hair v. United States 350 F.3d 1253 (Fed. Cir. 2003), a period of limitations does not accrue until an issue is actionable:

> The basic rule is that the clock of a statute of limitations begins to run from the date the plaintiff's cause of action "accrues," . . . A cause of action "accrues" when the plaintiff has a complete and present cause of action. "The earliest opportunity for a complete and present cause of action is that moment when the plaintiff has suffered a legally recognizable harm at the hands of the defendant, such as the time of contract breach or the commission of a tortious wrong."

Id. at 1260 (quoting 1 Calvin W. Corman, Limitation of Actions §6.1 (1991)).

As discussed in Preseault v. United States, 100 F.3d 1525 (Fed. Cir. 1996), the conversion of a railroad right-of-way to a recreational trail can constitute a Fifth Amendment taking. However, the cause of action and right to compensation do not vest until the claim accrues. In Boling v. United States, 220 F.3d 1365 (Fed. Cir. 2000) this court reiterated that: "In general, a takings claim accrues when 'all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.'") Id. at 1370 (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988)). From my colleagues' ruling that a taking occurred as soon as the possibility arose for trail conversion as an alternative to abandonment of the right-of-way, I must, respectfully, dissent.

The general rule in physical takings cases is that the taking is actionable when the property is taken and liability is fixed, not when it is suggested to be taken. In United States v. Clark, 445 U.S. 253 (1980) the Court stated that "physical takings by governmental bodies that may entitle a landowner to sue for compensation," 445 U.S. at 256, occur with the occupation of the property: "Condemnation proceedings, depending on the applicable statute, require various affirmative action on the part of the condemning authority. To accomplish a taking by seizure, on the other hand, a condemning authority need only occupy the land in question." 445 U.S. at 257. In Nollan v. California Coastal Comm'n, 483 U.S. 825, 832 (1987) the Court made clear that it is the permanent occupation or permanent right of traversal that triggers the owner's right to compensation, not the commencement of negotiations. See generally Dow v. United States, 357 U.S. 17 (1958) (the taking occurred when the property was occupied, not when the deed was transferred some time later). In Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) the Court focused on the permanent physical occupation of the property in determining

whether a taking had occurred, not the legislative or administrative events that authorized that occupation.

The NITU is prospective, and requires additional steps by the rail carrier and others before either of the two options authorized by the NITU will take legal effect. See 49 C.F.R. §1152.29. The NITU does not require that the railroad must consummate an agreement for rails-to-trails conversion. 48 C.F.R. §§1152.29(d), (e)(2); see National Wildlife Federation v. Interstate Commerce Comm'n, 850 F.2d 694, 700-02 (D.C. Cir. 1988). As discussed in the context of whether the issuance of a NITU must be preceded by an environmental impact study, the tentative aspect of the NITU is stressed:

> [I]ssuance of an NITU or CITU is not only incidental to the abandonment, but also is itself not a guarantee of eventual trail use. The NITU or CITU serves only "to provide an opportunity for the railroad and prospective trail users to negotiate an agreement; thus, when [the STB issues] a NITU or CITU there is only a possibility that a particular right-of-way actually will be used as a recreational trail."

Goos v. Interstate Commerce Comm'n, 911 F.2d 1283, 1293 (8th Cir. 1990) (emphasis in original).

When the government issued the NITU herein, it was not known whether the right-of-way would be converted to a recreational trail. If the ensuing negotiations had failed, such that the trail did not come into being, there could be no taking based on trail use. A suit for compensation is not ripe until the taking occurs. The panel majority states that "the termination of railroad use was still delayed by the NITU," maj. op. at 9, producing the incongruity whereby despite the delay in abandonment, the majority holds that the cause of action had already accrued. A "delay" of possible conversion to trail use, while it remains unknown whether trail use will occur at all, is not a per se taking with already vested entitlement to compensation. A taking claim does not accrue until "all events have

occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action." Seldovia Native Ass'n v. United States, 144 F.3d 769, 774 (Fed. Cir. 1998). The plaintiffs herein could not have sued for compensation while the trail use negotiations were ongoing; the period of limitations cannot accrue before suit could have been brought. Hair, 350 F.3d at 1260.

Indeed, the panel majority reinforces this view in its recognition that "So long as abandonment was not consummated, the STB retained jurisdiction over the right-of-way." Maj. op. at 11. Yet the "key date for accrual purposes is the date on which the plaintiff's land has been clearly and permanently taken." Boling, 220 F.2d at 1370 (citing Seldovia). A taking claim cannot accrue any earlier than when the indispensable event required to establish the government's liability has occurred. See Hash v. United States, 403 F.3d 1308, 1318 (Fed. Cir. 2005) ("On the railway's abandonment of its right-of-way these owners were disencumbered of the railway easement, and upon conversion of this land to a public trail, these owners' property interests were taken for public use, in accordance with the principles set forth in the Preseault cases.")

The panel majority errs in holding that the railroad's "willingness to negotiate a trail use agreement," maj. op. at 13, is an actionable Fifth Amendment taking. Although my colleagues extol the virtues of a "bright line" for accrual of the period of limitations, citing Caldwell v. United States, 391 F.2d 1226 (Fed. Cir. 2004), their choice of bright line would vest compensation rights although no taking may ever occur. The issuance of a Notice of Interim Trail Use is not a taking, whether or not railway use has already been abandoned, and independent of when trail use is successfully consummated. For a taking, "the alleged harm must be actual or imminent, not conjectural or hypothetical." Whitmore v. Kansas, 495 U.S. 149, 155 (1990). As elaborated in Preseault, 100 F.3d at 1530 ("We find no

05-1255, 05-5109                                      5

support in Vermont law for the proposition, propounded by the defendants and accepted by the dissent, that the scope of an easement limited to railroad purposes should be read to include public recreational hiking and biking trails."), liability for a taking is based on the change in use of the easement from railroad use to recreational trail. Until that change is fixed and its occurrence firm, there is no accrual of the right to recover compensation for such taking.

To the extent that <u>Caldwell</u> is construed to hold otherwise, as does the panel majority, <u>Caldwell</u> warrants review. We should sit *en banc* for this purpose, for the government advises that there are some twenty-two pending cases arising from the National Trails System Act. It is appropriate and necessary for this court to clarify the inconsistencies in our precedent.