2012 UT 66

The FUNDAMENTALIST CHURCH OF JESUS CHRIST OF LATTER–DAY SAINTS, an Association of Individuals, Plaintiff and Appellee,

v.

Thomas C. HORNE, Bruce R. Wisan, Mark L. Shurtleff, and the Honorable Denise Posse Lindberg, Defendants and Appellants,

and

Richard Jessop Ream, Thomas Samuel Steed, Don Ronald Fischer, Deal Joseph Barlow, Walter Scott Fischer, Richard Gilbert, and Brent Jeffs, Intervenors and Appellants.

No. 20120158.

Supreme Court of Utah.

Oct. 2, 2012.

Rodney R. Parker, Richard A. Van Wagoner, Frederick Mark Gedicks, Kenneth A. Okazaki, Stephen C. Clark, Salt Lake City, for appellee.

Mark P. Bookholder, Asst. Att'y Gen., Phoenix, AZ, for appellant Thomas C. Horne.

Jeffrey L. Shields, Mark L. Callister, Zachary T. Shields, Michael D. Stanger, Salt Lake City, for appellant Bruce R. Wisan.

Bridget K. Romano, Solicitor Gen., Salt Lake City, for appellant Mark L. Shurtleff.

C. Frederick Beckner III, Kathleen Moriarty Mueller, Amy Markopoulos, Washington, D.C., Brent M. Johnson, Salt Lake City for appellant the Honorable Denise Posse Lindberg.

Roger H. Hoole, Gregory N. Hoole, Salt Lake City, for intervenors.

Justice LEE, opinion of the Court:

¶ 1 In this case we are asked to answer a certified question from the United States Court of Appeals for the Tenth Circuit concerning the preclusive effect of a decision like that in *Fundamentalist Church of Jesus Christ of Latter–Day Saints v. Lindberg*, 2010 UT 51, 238 P.3d 1054. The state law question presented focuses specifically on whether our "discretionary review of a petition for extraordinary writ and subsequent dismissal on laches grounds" is a "decision 'on the merits' when it is accompanied by a written opinion, such that later adjudication of the same claim is barred." We answer the certified question in the affirmative: A decision like the one we reached in *Lindberg* is a decision "on the merits" for res judicata purposes that would thus preclude a subsequent action on the same claims between the same parties.

I

¶ 2 The certified question presented stems from litigation surrounding a Utah probate court's 2005 reformation and subsequent administration of a charitable religious trust formed by the predecessor to the Fundamentalist Church of Jesus Christ of Latter–Day Saints. At the time of the initial proceedings culminating in the reformation of the trust, plaintiff, an association of individual members of the FLDS church and beneficiaries of the trust (the FLDSA), declined to intervene or participate in the litigation. When the FLDSA eventually sought to attack the reformation years later, it did so on two fronts.

¶ 3 First, in October 2008, the FLDSA filed a complaint in the United States District Court for the District of Utah, asserting various state and federal constitutional challenges to the trust reformation and administration and seeking declaratory and injunctive relief. Eventually, the FLDSA moved for a temporary restraining order and a preliminary injunction against court administration of the trust. At that point, the federal court, upon agreement from the parties, stayed its proceedings "until the parties either reached a settlement or resumed the matter in court." *Fundamentalist Church of Jesus Christ of Latter–Day Saints v. Wisan*, 773 F.Supp.2d 1217, 1225 (D.Utah 2011). Meanwhile, in October 2009, the FLDSA filed an extraordinary writ petition with this court under Utah Rules of Civil Procedure 65B, asserting claims substantially similar to those in the federal case. *Fundamentalist Church of Jesus Christ of Latter–Day Saints v. Lindberg*, 2010 UT 51, 238 P.3d 1054. This court held that all but one of the FLDSA's claims (one we deemed unripe) were barred by the equitable doctrine of laches and dismissed the petition. *Id.* ¶ 36. In so doing, we cited the FLDSA's unexplained but conscious delay in waiting nearly three years to challenge the reformation and also noted the resulting injury "to those who relied on the Trust's modification." *Id.* ¶¶ 30–36.

¶ 4 The federal court then lifted its stay and invited further briefing on the motions pending there. After that briefing, the federal district court issued a memorandum opinion and order in February 2011 granting the FLDSA's preliminary injunction. *Wisan*, 773 F.Supp.2d at 1244. Though it acknowledged that Utah's preclusion law was unsettled, *id.* at 1238, the federal district court determined that our laches decision in *Lindberg* was not a judgment "on the merits for the purposes of res judicata," *id.* at 1242. In the absence of clear Utah precedent on the matter, the court reached this result by extrapolating "one common element" from approaches used elsewhere to determine whether laches dismissals warrant preclusive effect: "whether the underlying case in which laches was found included a fair examination of the circumstances and merits of the suit." *Id.* at 1239–40. The court then opined

that a proper laches analysis under Utah law requires consideration of the "relative harm to the [plaintiff]," which necessarily includes "an assessment of the merits of the plaintiffs' [constitutional claims]." *Id.* at 1240–41.

¶ 5 Unable to find any such analysis in the *Lindberg* opinion, the federal district court then determined that "the [FLDSA] ha[d] not yet had a forum in which their claims of serious constitutional violations have been entertained or addressed sufficiently to earn a finding that they were on the merits." *Id.* at 1241. In addition, the court concluded that the FLDSA was substantially likely to succeed on its constitutional claims, *id.* at 1233–34, and that those claims were not time-barred under its independent laches analysis, *id.* at 1236–38. The court accordingly granted the FLDSA's request for a preliminary injunction on those grounds, *id.* at 1244, and Defendants/Appellants appealed to the United States Court of Appeals for the Tenth Circuit.

¶ 6 The Tenth Circuit, recognizing that "the proper course in Utah is not well marked," formally certified to us its question about the state of Utah preclusion law. We now respond to that query.

## II

¶ 7 The posture of a matter certified to us by a federal court is unusual. "[T]raditional standards of review do not apply" because we are not asked "to affirm or reverse a lower court's decision."[1] *U.S. Fid. & Guar. Co. v. U.S. Sports Specialty Ass'n,* 2012 UT 3, ¶ 9, 270 P.3d 464 (internal quotation marks omitted). Yet although our role in a certified case is in that respect a step

removed from a particular case or controversy, our function in such matters nonetheless involves the exercise of judicial power.

¶ 8 Thus, we disagree at least in part with the FLDSA's request that we answer the certified question abstractly and without reference to the circumstances of the *Lindberg* case. Our function in a certified case is not to issue abstract, advisory opinions on general matters of interest to the federal courts. It is to resolve disputed questions of state law in a context and manner useful to the resolution of a pending federal case.

¶ 9 The certified question presented undoubtedly implicates our decision in *Lindberg.* And our resolution of that question can fulfill its purpose of facilitating the disposition of the underlying federal case only if our analysis is informed by and addresses the particular context in which the question arises.[2] That is confirmed by our appellate rule 41(c)(2), which requires that a certifying court's order "set forth all facts which are relevant to the determination of the question certified and which show the nature of the controversy, the context in which the question arose, and the procedural steps by which the question was framed." UTAH R. APP. P. 41(c)(2). If facts are necessary to frame a certified question, surely they may also be relevant to our answer. Our opinions in certified cases corroborate that conclusion. We routinely refer to surrounding facts and circumstances not just to set the stage for our resolution of questions certified by federal courts, but also to illustrate the application of our answer in the context of the case.[3]

---

1. This court "has original jurisdiction to answer questions of state law certified by a court of the United States." UTAH CODE § 78A-3-102(1). Rule 41 of the Utah Rules of Appellate Procedure governs this court's efforts when answering such questions.

2. *See Egbert v. Nissan Motor Co.,* 2010 UT 8, ¶ 13 n. 2, 228 P.3d 737 ("This court has noted that it will reformulate [a certified] question if necessary .... Therefore, even if the question were limited to the narrow reading proposed by [a party], we would reformulate the question ... in order for our answer ... to clarify the disputed issue of law and to assist the federal district

court." (internal quotation marks omitted)); *Miller v. United States,* 2004 UT 96, ¶ 10, 104 P.3d 1202 ("[We are] guided by a desire to provide meaningful and comprehensive assistance which, under certain circumstances, may require a more expansive answer than a literal reading of the certified question may warrant.").

3. *See, e.g., McArthur v. State Farm Mut. Auto. Ins. Co.,* 2012 UT 22, ¶¶ 33–38, 274 P.3d 981 (applying the answer to a certified question to the facts and circumstances of the underlying dispute); *Whitney v. Div. of Juvenile Justice Servs.,* Utah Dep't of Human Servs., 2012 UT 12, ¶¶ 18–19, 274 P.3d 906 (same).

¶ 10 That is not to say that our opinion on certification will itself resolve the underlying federal case. The resolution of the parties' competing claims and arguments will be up to the federal courts, which of course retain jurisdiction to decide this case under the law as they see it. That decision will be informed by our resolution of the state law issues presented, as the preclusive effect of a state court judgment is generally a matter of state law.[4] But except to clarify our law, we do not pretend to possess or exercise the authority to dictate the preclusive effect of our decision to the courts of a separate sovereign.[5] Those courts retain the independent authority to decide whether and to what extent to apply our law or to recognize limitations on or caveats to it. *See infra* ¶ 23 n.14.

¶ 11 With this in mind, our discussion below evaluates the preclusive effect of a decision like *Lindberg* in a purely state law context—as in a case similar to the current one but filed in a district court of the State of Utah. We do so, however, not in the abstract but in consideration of the facts and circumstances of *Lindberg*.

## III

¶ 12 Claim preclusion is one of two branches of the judicially created doctrine known as res judicata. *Mack v. Utah State Dep't of Commerce, Div. of Secs.*, 2009 UT 47, ¶ 29, 221 P.3d 194. It "is premised on the principle that a controversy should be adjudicated only once." *Id.* (internal quotation marks omitted). The law of preclusion promotes this principle by barring parties from relitigating claims that have already been litigated in a previous suit. *See id.*

¶ 13 This doctrine serves three important purposes: First, it "preserv[es] the integrity of the judicial system by preventing inconsistent judicial outcomes; [second, it] promot[es] judicial economy by preventing previously litigated issues from being reliti-

gated; and [third, it] protect[s] litigants from harassment by vexatious litigation." *See Gudmundson v. Del Ozone*, 2010 UT 33, ¶ 30, 232 P.3d 1059 (internal quotation marks omitted). Generally, we apply a three-part test to decide whether a claim is precluded:

> First, both [suits] must involve the same parties or their privies. Second, the claim that is alleged to be barred must have been presented in the first suit or be one that could and should have been raised in the first action [because it arose from the same transaction or operative facts]. Third, the first suit must have resulted in a final judgment on the merits.

*Mack*, 2009 UT 47, ¶ 29, 221 P.3d 194 (internal quotation marks omitted).

¶ 14 The FLDSA argues that *Lindberg* does not satisfy this test and thus has no res judicata effects because it was not a "final judgment on the merits." In the FLDSA's view, a decision like *Lindberg* falls short because it (1) stems from this court's discretionary jurisdiction over extraordinary writs; (2) did not properly examine each element of a laches affirmative defense; (3) resulted from inadequate or improper factual analysis; and (4) dismissed on laches grounds constitutional claims that are not subject to that affirmative defense.

¶ 15 We find none of these points sufficient to undermine the preclusive effect of a decision like that in *Lindberg*. Upon rejecting each of the FLDSA's arguments, we hold that *Lindberg* would preclude a subsequent action on the same claims by the same parties if filed in the Utah courts.

## A

¶ 16 The FLDSA's first point focuses on the discretionary nature of our extraordinary writ jurisdiction. It emphasizes that a preclusive judgment must be "on the merits," and insists that a decision like that in *Lindberg* does not qualify because it involves only

4. *Petersen v. Riverton City,* 784 F.Supp.2d 1234, 1238 (D.Utah 2011) ("[F]ederal courts [must] give preclusive effect to any state-court judgment that would have preclusive effect under the laws of the State in which the judgment was rendered." (internal quotation marks omitted)).

5. *See* 18 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE. JURISDICTION § 4405 (2d ed.) ("The first court does not get to dictate to other courts the preclusion consequences of its own judgment.").

a discretionary refusal to reach the merits of a dispute. This is an overgeneralization— and one that does not encompass a decision like *Lindberg*. Our *Lindberg* decision was on the merits for res judicata purposes, even though other exercises of jurisdiction over extraordinary writs would not be.

¶ 17 The Utah Constitution confers on this court "original jurisdiction to issue all extraordinary writs." UTAH CONST. art. VIII, § 3.[6] Our rules of civil procedure define a litigant's access to this jurisdiction: When "no other plain, speedy and adequate remedy is available," an aggrieved person may petition this court and "[a]ppropriate relief *may* be granted ... where an inferior court ... has exceeded its jurisdiction or abused its discretion." UTAH R. CIV. P. 65B(a), (d)(2)(A) (emphasis added).

■ ¶ 18 As the FLDSA notes, "a petitioner seeking rule 65B(d) extraordinary relief has no right to receive a remedy that corrects a lower court's mishandling of a particular case." *State v. Barrett*, 2005 UT 88, ¶ 23, 127 P.3d 682.[7] Thus, when presented with a petition for extraordinary writ, we may elect to deny relief even in the face of substantial and obvious errors of a lower court. The typical ground for doing so is a determination that there is a "plain, speedy and adequate remedy" available to correct any such errors. *See* UTAH R. CIV. P. 65B(a).

¶ 19 The FLDSA seeks to paint our *Lindberg* decision with this brush. Since some denials of extraordinary writs are based on the availability of an alternative remedy, the FLDSA insists that *Lindberg* was that kind of decision—and thus one that was not "on

the merits" for claim preclusion purposes. That is not an accurate characterization of our decision in *Lindberg*. We did not dismiss the petition in that case based on the availability of an alternative remedy; we did so in light of our resolution of the merits of the respondents' affirmative defense of laches.

■ ¶ 20 That sort of decision is "on the merits" for res judicata purposes. It is well settled that the discretionary character of an extraordinary writ proceeding "does not, ipso facto, preclude a judgment rendered therein from operating as res judicata in another action or proceeding." [8] Thus, a judgment on an extraordinary writ is preclusive if the judgment reached the "merits" of the issues presented.[9] A decision declining to reach the merits based on the availability of an alternative remedy, on the other hand, is not preclusive.

[9] ¶ 21 The FLDSA reads *Lindberg* as falling in the latter category, citing a sentence in our opinion in which we "decline[d] to reach the merits of [its] claims." *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 2010 UT 51, ¶ 43, 238 P.3d 1054. That argument takes this sentence out of context. In context, it is apparent that we were simply clarifying our decision to resolve the *Lindberg* case on the basis of an affirmative defense (laches); the "merits" we declined to reach were not the merits of the laches defense but of the underlying constitutional challenges to the trust's reformation. That does nothing to undermine our characterization of *Lindberg* as a

---

**6.** *See* UTAH CODE § 78A-3-102(2) ("The Supreme Court has original jurisdiction to issue all extraordinary writs and authority to issue all writs and process necessary to carry into effect its orders, judgments, and decrees or in aid of its jurisdiction.").

**7.** *See State v. Laycock*, 2009 UT 53, ¶ 8, 214 P.3d 104 ("Relief under rule 65B(d)(2) is completely at the discretion of the reviewing court.").

**8.** E.T. Tsai, Annotation, *Judgment Granting or Denying Writ of Mandamus or Prohibition as Res Judicata*, 21 A.L.R.3d 206 (1968).

**9.** *See United States v. Dean*, 752 F.2d 535, 541 (11th Cir.1985) ("[A] prior denial of a petition for a writ ... will have *res judicata* effect only if the

denial was 'on the merits,' but not if the denial was the result of the special limitations inherent in the writ[.]"); *Topps v. State*, 865 So.2d 1253, 1257 (Fla.2004) ("[W]e do not intend to foreclose a litigant from possible relief in another court if a [writ] has not been determined on the merits ...."); *State ex rel. Kopchak v. Lime*, 44 Ohio St.2d 3, 335 N.E.2d 700, 701 (1975) (per curiam) (writ of mandamus reaching merits of the case has preclusive effect); 18A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4445 (2d ed.) ("Preclusion is appropriate only if denial [of an extraordinary writ] rested on the merits of the questions presented rather than remedial limitations.").

merits-based decision sustaining preclusive effects. A decision denying relief on laches grounds is "on the merits" for claim preclusion purposes.

¶ 22 Our case law defines "the merits" for res judicata in light of rule 41 of the Utah Rules of Civil Procedure. Under rule 41(b):

> Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction or for improper venue or for lack of an indispensable party, operates as an adjudication upon the merits.[10]

As we indicated in *Madsen v. Borthick*, rule 41 "comprehensively define[s] a dismissal on the merits." 769 P.2d 245, 248 (Utah 1988). It establishes a presumption that the dismissal of a case is "on the merits" and thus

has preclusive effect, subject to exceptions where the court "otherwise specifies" or where the decision is for lack of jurisdiction, improper venue, or for failure to join a necessary party.[11]

¶ 23 The case law under federal rule 41[12] is to the same effect.[13] Federal courts read the federal rule's reference to "adjudication upon the merits" as "the opposite of a 'dismissal without prejudice,'" the primary meaning of which is "dismissal without barring the plaintiff from returning later, to the same court, with the same underlying claim." *Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001). Under *Semtek*, federal rule 41 governs the preclusive effect that dismissals in one jurisdiction have over subsequent actions brought in that same jurisdiction. *Id.* at 506.[14] That is not to say that

**10.** As this rule suggests, the res judicata effect of a dismissal is dictated by the grounds for and not the form of the court's decision. So, to answer the circuit court's question about the significance for preclusion law of a written opinion, we conclude that such an opinion may be informative but that it is hardly dispositive. Thus, the existence of a written opinion is significant only insofar as it demonstrates the grounds for the decision. An oral dismissal from the bench could be preclusive if it were on the merits, just as a written decision would not qualify as preclusive if it were not on the merits.

**11.** UTAH R. CIV P. 41(b); *see Miller v. USAA Cas. Ins. Co.*, 2002 UT 6, ¶¶ 61–62, 44 P.3d 663 (citing rule 41(b) for its holding that dismissal for lack of jurisdiction is not "on the merits").

**12.** Rule 41(b) of the Federal Rules of Civil Procedure provides, in part: "Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure to join a [necessary party]—operates as an adjudication on the merits."

**13.** *See Bichler v. DEI Sys., Inc.*, 2009 UT 63, ¶ 24 n. 2, 220 P.3d 1203 ("Because the Utah Rules of Civil Procedure are patterned after the Federal Rules of Civil Procedure ... we may look to the Federal Rules of Civil Procedure for guidance."); *Tucker v. State Farm Mut. Auto. Ins. Co.*, 2002 UT 54, ¶ 7 n. 2, 53 P.3d 947 ("Interpretations of the Federal Rules of Civil Procedure are persuasive where the Utah Rules of Civil Procedure are 'substantially similar' to the federal rules.").

**14.** *Semtek* declined to read federal rule 41 to extend a step further—to dictate how a federal court's dismissal should be treated in a second, different jurisdiction. *Semtek Int'l, Inc. v. Lock-*

*heed Martin Corp.*, 531 U.S. 497, 503, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001). As the *Semtek* court noted, "[i]t would be peculiar to find a rule governing the effect that must be accorded federal judgments by other courts ensconced in rules governing the internal procedures of the rendering court itself." *Id.* We agree and likewise construe our rule narrowly. Thus, our Utah rule establishes the preclusive effect of a Utah judgment in Utah courts. It does not by its terms bind the courts of a separate sovereign.

We accordingly decline to address the authorities cited by the FLDSA raising the question whether a time-bar dismissal in state court, though preclusive there, would bind a federal court presented with the same claim. The case law is in some disarray on this matter, with some courts finding a state time-bar dismissal preclusive of subsequent federal litigation, *see, e.g.,* *Seavey v. Chrysler Corp.*, 930 F.Supp. 103, 108–09 (S.D.N.Y.1996), and others finding the time-bar dismissal to bar only the remedy sought in the time-barred suit, but not the right itself, *see, e.g.,* *Martel v. Stafford*, 992 F.2d 1244, 1245–46 (1st Cir.1993). But we have no occasion here to opine on this matter, as it concerns the existence and scope of the federal courts' authority to exercise their independent sovereignty to recognize federal limitations on or caveats to our state law of preclusion. Perhaps the federal courts will decide, as the FLDSA suggests, that federal sovereignty sustains a ground for recognizing an independent, federal notion of timeliness—e.g., a notion of laches that departs from or overrides our own. But that is a federal prerogative, not one for us to comment on—except perhaps to note the possibility that even if the federal courts were to adopt a standard of laches incorporating elements different from our own, we presume that a Utah judgment may nonetheless be grant-

the exceptions enumerated in rule 41 are exhaustive. The rule's list is merely illustrative, as we adopted in *Madsen*, 769 P.2d at 248.[15] And the case law under the federal rule is along the same lines. The rule's list of non-preclusive dismissals—lack of jurisdiction, venue, and failure to join a necessary party—simply illustrates the types of dismissals that do not preclude further litigation.[16]

¶ 24 As a general rule, dismissals resulting from an "initial bar" to the court's adjudication of the parties' claims and defenses are not preclusive. *See Costello v. United States*, 365 U.S. 265, 286, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). An initial bar to the court's authority exists when venue or jurisdiction is lacking or the wrong parties are before the court. *See* UTAH R. CIV. P. 41(b).´ So, while dismissal for lack of capacity to sue is not phrased in terms of "lack of an indispensable party," such a dismissal is not preclusive. *Stewart v. K&S Co.*, 591 P.2d 433, 434 & n. 1 (Utah 1979) (deciding that dismissal because one of the parties is not the real party in interest is not on the merits).[17]

¶ 25 When an initial bar exists, the court has authority to opine only on the law and facts surrounding its own power.[18] Once proper jurisdiction, parties, and venue are established, however, any subsequent dismissal is preclusive because it is driven not by limitations on the court's authority, but by the parties' actions or the claims and defenses asserted.

¶ 26 Under these standards, we have no hesitation in concluding that a dismissal based on laches is a judgment on the merits under rule 41 and thus preclusive in Utah courts.[19] Laches is not a threshold matter that affects a court's authority to hear a claim. It instead requires a court to consider the claims and defenses asserted. It does not fit comfortably into any of the enumerated categories that do not warrant preclusive treatment. Accordingly, because *Lindberg* dismissed the FLDSA's claims on laches grounds instead of merely declining to exercise its jurisdiction because a "plain, speedy, and adequate remedy [was] available," *see* UTAH R. CIV. P. 65B(a), or because some other initial bar existed, the FLDSA's claims would face a time-bar in a subsequent action brought in a Utah court.

**B**

¶ 27 The FLDSA next points to the fact that the *Lindberg* court's laches decision nowhere considered the merits of the underlying constitutional claims. That fact forecloses the preclusive effect of *Lindberg*, in the FLDSA's view, under the standard set forth in *Papanikolas Brothers Enterprises v.*

---

ed issue-preclusive effects on any elements they share in common (e.g., the unreasonableness of the FLDSA's delay or the prejudice caused to other parties). *See Taylor v. N.Y.C. Transit Auth.*, 309 F.Supp. 785, 790 (E.D.N.Y.1970) (deciding that laches decision in previous court did not bar court's consideration of the claims, but holding that it was "bound under the doctrine of collateral estoppel to accept as true any material facts necessarily found by the state courts" in their laches decisions).

15. *See Costello v. United States*, 365 U.S. 265, 286, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961) ("In defining the situations where dismissals ... operate as adjudications on the merits, ... it seems reasonable to confine them to those situations where the policy behind the enumerated grounds is equally applicable.").

16. *See Rinehart v. Locke*, 454 F.2d 313, 314 (7th Cir.1971) ("[T]he list in Rule 41(b) of types of dismissal which are not presumptively adjudications on the merits is not exclusive ....").

17. *See Nat'l Crime Reporting, Inc. v. McCord & Akamine, L.L.P.*, 177 Ohio App.3d 551, 895 N.E.2d 255, 257–58 (2008) (finding that dismissal based on lack of capacity to sue was not on the merits); *see also MacAffer v. Boston & M.R.R.*, 268 N.Y. 400, 197 N.E. 328, 328–29 (1935) (same).

18. *See Cook v. Peter Kiewit Sons Co.*, 775 F.2d 1030, 1035 (9th Cir.1985) (dismissal for lack of subject-matter jurisdiction is not on the merits as the court "retain[s] no power to make judgments relating to the merits of the case"); *see also Shoup v. Bell & Howell Co.*, 872 F.2d 1178, 1181 (4th Cir.1989) (denying preclusive effect to dismissals where a court, regardless of the merits, "cannot speak" because "[t]he power to declare law ... is [not] present" (internal quotation marks omitted)).

19. *See Murphy v. A/S Sobral*, 187 F.Supp. 163, 164 (S.D.N.Y.1960) (holding that laches dismissal is on the merits under federal rule 41).

*Sugarhouse Shopping Center Associates,* 535 P.2d 1256 (Utah 1975). Specifically, under *Papanikolas,* the FLDSA asserts that a full and proper laches analysis "requires express consideration of the merits of [underlying] claims in the court's opinion dismissing for laches, so as to determine their seriousness and the degree of harm that plaintiff might suffer if the court does not adjudicate them." And because *Lindberg* included no such consideration of the merits of the FLDSA's constitutional claims, it views the decision as one declining to exercise jurisdiction and not "on the merits" [20] for preclusion purposes.

¶ 28 We disagree. This argument is based on a misunderstanding of our laches precedent and law of preclusion, which we now take occasion to clarify. First, we explain that the origin of "harm to the plaintiff" as a factor in a laches analysis is suspect and conclude that weighing "harm to the plaintiff" has no place in our general laches jurisprudence. Second, and in view of this holding, we reject the FLDSA's argument that a proper laches analysis must examine the relative strength or weakness of a plaintiff's underlying claim. That kind of analysis is not merely unnecessary; it is forbidden.

▮▮▮▮ ¶ 29 The doctrine of laches "is 'based upon [the] maxim that equity aids the vigilant and not those who slumber on their rights.'" *CIG Exploration, Inc. v. State,* 2001 UT 37, ¶ 14, 24 P.3d 966 (alteration in original) (quoting BLACK'S LAW DICTIONARY 787 (6th ed. 1990)). In Utah, laches traditionally has two elements: "(1) [t]he lack of diligence on the part of plaintiff" and "(2) [a]n injury to defendant owing to such lack of diligence." *Papanikolas,* 535 P.2d at 1260 ("Laches is not mere delay, but delay that works a disadvantage to another."). Neither of these elements requires a court to consider the strength or weakness of the plaintiff's underlying claims.

¶ 30 It is true, as the FLDSA indicates, that there is stray dicta in *Papanikolas* suggesting that "harm to the plaintiff" is a factor in a laches analysis. *See id.; see also Fundamentalist Church of Jesus Christ of Latter–Day Saints v. Lindberg,* 2010 UT 51, ¶ 28, 238 P.3d 1054 (quoting *Papanikolas's* dicta). Yet the context of the *Papanikolas* decision forecloses the reading that the FLDSA gives to this language. In *Papanikolas,* the defendant built a structure on property reserved under a restrictive covenant for parking to serve nearby businesses. *Papanikolas,* 535 P.2d at 1259. When the plaintiff complained, the court considered whether laches barred enforcement of the restrictive covenant, citing the traditional two-pronged laches test detailed above. *Id.* at 1260. The court went on, however, to list "factors considered by the courts in determining the existence or nonexistence of laches," including:

> the relative harm to defendant, in view of plaintiff's delay, if he is required to remove the structure which violates the covenant; *the relative harm to the plaintiff, if he is confined to an action for damages;* the proximity of the expiration date of the covenant; and the defendant's good faith, or the absence thereof; in connection with his violation of the covenant.

*Id.* (emphasis added). *Papanikolas* cited an American Law Reports annotation [21] as the sole authority for these "factors" and disposed of the defendant's laches defense without further mention of "harm to the plaintiff." *Id.* at 1261.

¶ 31 The *Papanikolas* notion of "harm to the plaintiff" is best understood not as a component of laches, but as part of a broader, equity-based inquiry that is particular to certain real property disputes. In these disputes, "harm to the plaintiff" is a factor that

---

20. "Merits" is an unfortunate and potentially confusing term as used here. In this opinion, we discuss both "final judgments on the merits," *supra* ¶¶ 16–26, and "the merits of underlying claims," *supra* ¶ 27; *infra* ¶¶ 36–39. These two conceptions of "merits" are different and should not be conflated. The first sense of merits is concerned with identifying the grounds upon which a dismissal rests; the second with the viability—as suggested by relevant facts and ap-propriate law—of claims made. One has nothing to do with the other, and the standards we detail today for one have no bearing on the standards applicable to the other.

21. R.D. Hursh, Annotation, *Laches or Delay in Bringing Suit as Affecting Right to Enforce Restrictive Building Covenants,* 12 A.L.R.2d 394 (1950).

works with laches—not within it—to evaluate whether an injunction for restrictive covenant violations or the like is proper.

¶ 32 *Valhouli v. Coulouras*, 101 N.H. 320, 142 A.2d 711 (1958), involved one such dispute and sheds light on this court's approach in *Papanikolas*. In that case, the defendant built two dwellings on his land where a covenant allowed only one, and the plaintiff complained, requesting a mandatory injunction ordering the defendant to remove the second dwelling. *Id.* at 711–12. The trial court denied the request on laches grounds, *id.*, and the New Hampshire Supreme Court affirmed and outlined the particular rules regarding injunctions and real property disputes:

> Delay for an unreasonable length of time in bringing the suit after knowledge of the breach may be the basis for the equitable defense of laches, particularly where a mandatory injunction is being sought. This is particularly so in view of the further finding that the relative hardship in granting relief to the plaintiffs was disproportionate to the benefit secured thereby. Thus a combination of laches and disproportion between harm and benefit may have the effect of causing the denial of an injunction when neither alone would have caused such denial.

**22.** *See id.* (listing cases described as "holding that injury which would result to defendant as a result of the granting of an injunction outweighs that which is caused plaintiff by violation of the restrictive building covenant").

**23.** *See Cherry v. Bd. of Home Missions of Reformed Church in U.S.*, 254 Mich. 496, 236 N.W. 841, 842–44 (Mich.1931) (refusing to enjoin construction of a bigger church in a residential neighborhood because defendant already had, by reason of plaintiff's waiver, the right to operate a church on the property, because the bigger church would not work a hardship on the plaintiff, and because requiring defendant to relocate would cause significant "financial sacrifice").

**24.** Though *Lindberg* mentions *Papanikolas's* "harm to the plaintiff" factor as being part of a laches inquiry, it does so as a supplement to the more general, accepted laches factor test. *See Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 2010 UT 51, ¶ 28, 238 P.3d 1054 ("[W]e consider the relative harm caused by the petitioner's delay, the relative

*Id.* at 713 (citations and internal quotation marks omitted).

¶ 33 *Papanikolas* can and should be read as attempting to accomplish the same result. Indeed, the A.L.R. annotation cited in *Papanikolas* for the "harm to the plaintiff" factor confirms that the *Papanikolas* court was attempting to articulate *Valhouli's* "laches plus disproportionate harm equals denial of injunction" standard.[22] It lists cases that, like *Valhouli*, treat harm-balancing not as part of a laches analysis, but as its partner in a greater equitable inquiry.[23]

¶ 34 In addition to making good sense, this view of *Papanikolas* has the added virtue of being consistent with how Utah courts have actually applied that case. Apart from our opinion in *Lindberg*,[24] no Utah case has cited *Papanikolas's* "harm to the plaintiff" factor as being part of a laches analysis.[25] Indeed, the cases merely cite *Papanikolas* as authority for the traditional two-part laches test without mention of any additional "factors." Cases that do mention *Papanikolas's* equity-based harm-balancing are of the *Valhouli* variety—property disputes involving injunctive relief for restrictive covenant and building violations—and in no way suggest that "harm to the plaintiff" is a component of laches.[26]

harm to the petitioner, and whether or not the respondent acted in good faith."). This kind of passing reference, unaccompanied by meaningful discussion and a stated intention to alter a long-standing rule of law, cannot transform what has historically been a two-part inquiry into a three-part inquiry.

**25.** *See, e.g., Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 731 (Utah 1990); *Utah State Dep't of Soc. Servs. ex rel. Borland v. Chandler*, 733 P.2d 144, 147 (Utah 1987); *Angelos v. First Interstate Bank of Utah*, 671 P.2d 772, 777 (Utah 1983); *Jacobson v. Jacobson*, 557 P.2d 156, 158–59 & n. 11 (Utah 1976); *Estate of Higley v. State of Utah, Dep't of Transp.*, 2010 UT App 227, ¶ 17, 238 P.3d 1089.

**26.** *See, e.g., Johnson v. Hermes Assocs.*, 2005 UT 82, ¶ 32, 128 P.3d 1151; *Culbertson v. Bd. of Cnty. Comm'rs*, 2001 UT 108, ¶ 56, 44 P.3d 642; *Carrier v. Lindquist*, 2001 UT 105, ¶ 31, 37 P.3d 1112; *Crimmins v. Simonds*, 636 P.2d 478, 480 (Utah 1981); *Carter v. Done*, 2012 UT App 72, ¶ 20, 276 P.3d 1127.

¶ 35 The bottom line is that our laches jurisprudence is concerned only with prejudice to a defendant caused by a plaintiff's unexplained and unreasonable delay; "harm to the plaintiff" has no place in that analysis and would likely operate to frustrate the very goals laches pursues. This would be particularly true if we accepted the FLDSA's suggestion that "harm to the plaintiff" requires a court to evaluate the merits of the plaintiff's underlying substantive claims. *Papanikolas* contains no such requirement, and we decline to adopt one here.

¶ 36 At most, *Papanikolas* countenances an evaluation of "harm to the plaintiff, *if* he is confined to an action for damages." 535 P.2d at 1260 (emphasis added). That qualifying phrase confirms that the court is not concerned with *any* harm to the plaintiff, but a specific type of harm: harm that would result if the plaintiff is limited to one particular remedy. Put in the context of *Papanikolas*, "harm to the plaintiff" meant being forced to accept, in exchange for money damages, a structure built on land that was meant to serve as parking for nearby businesses. Thus, "harm to the plaintiff" contains an implicit assumption that the plaintiff's claims have merit and that the plaintiff deserves redress in some fashion. This assumption cannot coexist with the notion that examination of the merits of a plaintiff's claims is required.

¶ 37 A different result—one where a court's recognition of meritorious claims could defeat a laches defense—would be antithetical to the whole point of the doctrine of laches. Laches is designed to shelter a prejudiced defendant from the difficulties of litigating meritorious claims after an unexplained delay.[27] It "is a negative equitable remedy ... which deprives one of some right or remedy *to which he would otherwise be entitled*, because his delay in seeking it has operated to the prejudice of another." *Petterson v. Ogden City*, 111 Utah 125, 176 P.2d 599, 604 (1947) (emphasis added) (internal quotation marks omitted).[28] Thus, whatever weighing "harm to the plaintiff" means, it certainly cannot require defendants to prove that the claims against them are without merit in order to prevail on a defense meant to free them from litigating even meritorious claims.

¶ 38 If laches required this showing, prejudice would be built into a doctrine established to prevent it. Specifically, unavailable or long-lost evidence and witnesses—long recognized as prejudice-causing results of delay[29]—would impair a defendant's ability to illustrate, during a laches merits review, the weaknesses of a plaintiff's claims. We refuse to construe the laches defense to be so self-defeating.

¶ 39 Thus, the *Lindberg* court's failure to consider the merits of the FLDSA's claims in its laches analysis is neither fatal nor rele-

27. *See Hamilton v. Dooly*, 15 Utah 280, 49 P. 769, 773 (1897) (discussing loss of evidence and witnesses after a time-lapse).

28. *See Jones Mining Co. v. Cardiff Mining & Milling Co.*, 56 Utah 449, 191 P. 426, 429 (1920) ("While courts may not approve of what may have been done, if done wrongfully, they, nevertheless, refuse relief ...."); *see also Harlan v. United States*, No. 89 Civ. 6951, 1991 WL 35858, at *4 (S.D.N.Y. Mar. 8, 1991) ("[E]ven if plaintiffs' claims for relief were otherwise meritorious, the equitable doctrine of laches bars relief."); *Garris v. Dickey*, 22 Md.App. 618, 325 A.2d 156, 160 (1974) ("[T]he long and unexcused delay in prosecuting [the] claim, and the prejudice resulting from it, amounted to laches, and alone was sufficient to bar the appellants from asserting any claim to the property, whether meritorious or not."); *Titus v. Titus*, 154 N.W.2d 391, 396 (N.D.1967) ("Examples of matters which are sufficient to bar by law a recovery on a meritorious claim are the affirmative defenses of res judicata, releases, statute of frauds, statutes of limitations and laches."); *Ciletti v. City of Washington*, 392 Pa. 204, 140 A.2d 98, 99 (1958) ("It is unnecessary to discuss and decide each of appellants' numerous contentions, because we are of the opinion that their action is barred by laches."); *Chambers of S.C., Inc. v. Cnty. Council*, 315 S.C. 418, 434 S.E.2d 279, 281 (1993) ("However meritorious [plaintiff's] claim would have been if timely made, we hold the claim is barred by laches.").

29. *See Young v. W. Piling & Sheeting*, 680 P.2d 394, 395 (Utah 1984) (finding prejudice because "[s]ome witnesses may no longer be available; recollections may be dimmed. Valuable evidence may have long been discarded or destroyed."); *Kuhn v. Mount*, 13 Utah 108, 44 P. 1036, 1038 (1896) (imposing a time bar where "the transaction has faded from memory, or the evidence has been lost").

vant to that decision's preclusive effect. Because the court dismissed the FLDSA's petition based on the two essential elements of our laches standard, *see Lindberg*, 2010 UT 51, ¶ 43, 238 P.3d 1054, that decision is preclusive under Utah law.[30]

## C

¶ 40 The FLDSA next argues that this court's factual analysis in *Lindberg* was insufficient to sustain the preclusive effect of that decision. Because a finding of laches depends "on the circumstances of each case," *Papanikolas Bros. Enters. v. Sugarhouse Shopping Ctr. Assocs.*, 535 P.2d 1256, 1260 (Utah 1975), a laches determination may turn on questions of fact, and the FLDSA insists this court was not equipped to resolve such questions in *Lindberg*. Specifically, because our *Lindberg* decision did not resolve disputed questions of fact, the FLDSA contends that it is preclusive only as to subsequent requests for extraordinary relief. We disagree.

¶ 41 When a court rules on a petition for extraordinary writ, it exercises original jurisdiction. *See Gates v. Taylor*, 2000 UT 33, ¶ 3, 997 P.2d 903 (per curiam). Although in such matters we are "not in a position to arrive at a legal ruling that is dependent on the resolution of disputed facts," *Carpenter v. Riverton City*, 2004 UT 68, ¶ 4, 103 P.3d 127 (per curiam),[31] we may rule on extraordinary writ petitions where material facts are undisputed or where there

is a "record below to aid this court in resolving those disputes," *see id.* Thus, our

determination of whether this court may adjudicate a petition is not unlike a district court's decision to grant summary judgment. Where a petition is presented on uncontroverted material facts ... and it is otherwise appropriate for this court to exercise its jurisdiction to issue extraordinary relief, it may issue a judgment on the merits.

*Id.* ¶ 5.[32] In such situations, we are as "well-positioned as a trial judge to assess the evidence at issue." *See Bahr v. Imus*, 2011 UT 19, ¶ 15 n. 1, 250 P.3d 56 (internal quotation marks omitted).

¶ 42 At oral argument, counsel for the FLDSA acknowledged that the dispositive facts supporting the *Lindberg* court's laches decision—those concerning unexplained delay and prejudice—were undisputed. Though the FLDSA took exception to the way these facts were documented in the record, it acknowledged that all of the parties supposed that they existed.[33] In addition, the *Lindberg* court had before it the entire record from the probate proceedings. That court was accordingly within its authority and in an excellent position to conduct the factual analysis necessary to support its laches decision.[34]

¶ 43 The FLDSA's arguments to the contrary smack of sour grapes. By submitting its extraordinary writ petition to the *Lindberg* court, the FLDSA implicitly certified that all the facts necessary to decide the

**30.** On this score, we are in accord with the Arizona Supreme Court's holding in *Day v. Estate of Wiswall*, 93 Ariz. 400, 381 P.2d 217 (1963), of which both the federal district court and the circuit court made special mention. Insofar as *Johnson v. City of Loma Linda*, 24 Cal.4th 61, 99 Cal.Rptr.2d 316, 5 P.3d 874 (2000)—the other case both courts cite as instructive—holds that a laches decision is not preclusive because it does not reach the merits of underlying claims, we disagree with that holding and decline to follow it.

**31.** Except in situations where a special master is appointed. *See Carpenter v. Riverton City*, 2004 UT 68, ¶ 4, 103 P.3d 127 (per curiam).

**32.** *See Moreau v. Lewis*, 648 So.2d 124, 126 n. 4 (Fla.1995) (deciding to consider a writ of mandamus, in part, because "no relevant factual dis-

pute remains which would require extensive fact-finding").

**33.** *See Carpenter*, 2004 UT 68, ¶ 5, 103 P.3d 127 (noting that material facts can be uncontroverted by stipulation or unopposed affidavits).

**34.** Our decision in *Renn v. Utah State Board of Pardons* supports this result. 904 P.2d 677 (Utah 1995). In that case, we ultimately concluded that Utah Rule of Civil Procedure 65B petitions may be dismissed on laches grounds. *Id.* at 684. Implicit in this holding is the determination that courts considering rule 65B petitions may properly make the factual determinations a laches dismissal requires.

issues presented in the petition were before the court. And although the laches defense was not raised by the petition itself but by the respondents' opposition to it, the FLDSA's response to that defense was telling: The FLDSA nowhere asserted that factual disputes regarding laches precluded a conclusive judgment on the petition for extraordinary writ, and nowhere suggested a need for discovery or adversarial resolution of disputed questions of fact. By instead pressing forward with a request for issuance of the writ, the FLDSA waived any objection based on a need for adversarial development of questions of fact. Any doubt on that score disappeared, moreover, when this court issued its *Lindberg* opinion and the FLDSA made no timely attempt to challenge its factual premises in a petition for rehearing.

¶ 44 That the FLDSA now insists that the *Lindberg* court's factual analysis was faulty is suspect, particularly given its reliance on the federal district court's contrary resolution of the laches question. The federal district court held no evidentiary hearing and made no findings of fact. Yet the FLDSA has no dispute with that court's determination that there was no basis for application of the doctrine of laches, a determination the FLDSA lauds as "appropriate, legally correct, and within that court's jurisdiction to decide." In context, it appears that the FLDSA's real complaint is not that *Lindberg* was factually flawed, but that it didn't go its way. But of course the preclusive effect of our decision in *Lindberg* does not depend on the FLDSA's satisfaction with it. Indeed, "[claim preclusion] rests on a determination that justice is better served by attributing finality to judgments ... than by second efforts at improved results." *Shoup v. Bell & Howell Co.*, 872 F.2d 1178, 1182 (4th Cir.1989) (second alteration in original) (internal quotation marks omitted).

¶ 45 We therefore conclude that this court's factual analysis in *Lindberg* was prop-

er and in no way impairs the preclusive effect of that decision. The submissions of both parties and the complete record from the probate proceedings provided an adequate factual basis from which to make a laches determination. That the FLDSA now regrets that outcome cannot alter its preclusive effect.

### D

¶ 46 The FLDSA's final challenge to the preclusive effect of *Lindberg* is rooted in its notion that Establishment Clause claims are somehow immune from the reach of a laches time bar. Specifically, the FLDSA asserts that the Establishment Clause is a "structural" restraint of government power that arises "from the constitution's division of power between the states and the federal government and its branches"—a restraint not subject to waiver or interest balancing because it "delineate[s] non-transgressable limits on government action." And, in the FLDSA's view, if a government actor cannot waive structural violations, a litigant's right to complain about those violations is likewise not subject to timebar.

¶ 47 This argument falters on the ground that it confuses a government branch's inability to ratify unconstitutional power-grabs with a litigant's perpetual right to prosecute structural constitutional claims. The cases cited by the FLDSA simply conclude that a branch of government cannot waive infringement or enlargement of its constitutional power.[35] But that proposition in no way sustains the FLDSA's position here. Saying that a government actor cannot accept more or less power than the Constitution gives it does not *ipso facto* bestow on individual litigants a never-ending right to challenge perceived constitutional violations. These two concepts are logically and legally distinct.

¶ 48 The FLDSA tries to unite them with the idea that the "passage of time, even with

---

35. *See, e.g., Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) ("[P]arties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2."); *I.N.S. v. Chadha*, 462 U.S. 919, 959, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("There is

no support in the Constitution or decisions of this Court for the proposition that the cumbersomeness and delays often encountered in complying with explicit Constitutional standards may be avoided, either by the Congress or by the President.").

reliance, does not validate an otherwise prohibited governmental exercise of power." This reasoning is neither new nor persuasive. The argument was thoroughly and persuasively rejected in *Hair v. United States,* 350 F.3d 1253 (Fed.Cir.2003), a takings case brought under the Fifth Amendment. In *Hair,* the court considered whether a right originating in the constitution is subject to limitations on its enforcement. *Id.* at 1256. In support of the view that certain constitutional claims are not subject to time bar, the plaintiffs argued that "if Congress lacks the constitutional power to take private property without paying for it, [it cannot] suddenly get the power after" a lapse in time. *Id.* at 1257. The court appropriately rejected this argument as meritless, explaining that the constitutional right to just compensation is not absolute, "any more than any other right is absolute. The remedy afforded by the Fifth Amendment is subject to a reasonable time bar designed to protect other important societal values." *Id.* at 1260.

¶ 49 As *Hair* illustrates, the idea that lapse of time cannot validate wrongfully exercised power is far from unique to structural constitutional violations, as the FLDSA insists. Indeed, it is theoretically applicable to every case—even the most pedestrian civil cases between private individuals—that is dismissed as time-barred. Any litigant so dismissed could claim that the court ratifies the offensive conduct in doing so and has, effectively, conferred on its opponent power to engage in the offensive conduct.

¶ 50 In reality, however, dismissal of a structural constitutional claim—or any claim, for that matter—on laches grounds is not a validation of power. A time-bar dismissal does not imply a simultaneous determination of governmental power to act outside constitutional bounds. It merely indicates that a particular litigant has forfeited a right to complain about such ultra vires acts. So while the government actor may escape punishment in one instance, any continuing or ongoing violation subjects it to further suits by litigants—perhaps even the same litigant—who diligently pursue their claims.

¶ 51 Our opinion in *Lindberg* recognized this principle. Specifically, we held that the FLDSA's challenge to the trust reformation was barred and included in that holding the majority of the FLDSA's claims because they "either occurred before or as part of the district court's modification of the [t]rust." 2010 UT 51, ¶ 37, 238 P.3d 1054. The only claim that arose from facts occurring after trust modification was dismissed not as time-barred but as unripe. *Id.* ¶ 36. If the hypothetical (or future) violations the FLDSA describes ever materialize and are unrelated to the trust modification, they would be unaffected by the *Lindberg* decision and the FLDSA's laches.

¶ 52 For these reasons, we are not persuaded that so-called structural constitutional violations are any less subject to time-bar than are garden-variety constitutional claims.[36] We think the correct view is that a litigant gives up its right to challenge even structural violations when its unexplained delay in asserting the challenge prejudices other parties.[37] We therefore hold that "[a] constitutional claim"—even a structural one—"can become time-barred just as any other claim can. Nothing in the Constitution requires otherwise." *See Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands,* 461 U.S. 273, 292, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983) (citations omitted).

## IV

¶ 53 For the foregoing reasons, we conclude that a decision like the one reached in *Lindberg*—dismissing an extraordinary writ on laches grounds—would preclude a subsequent claim brought in Utah courts.

Justice LEE authored the opinion of the Court, in which Chief Justice DURRANT, Associate Chief Justice NEHRING, Justice DURHAM, and Justice PARRISH joined.

---

**36.** *See, e.g., Perry v. Judd,* 840 F.Supp.2d 945, 953–55 (E.D.Va.2012) (barring First and Fourteenth Amendment claims on laches grounds).

**37.** *See Southside Fair Hous. Comm. v. City of New York,* 928 F.2d 1336, 1354 (2d Cir.1991) (holding in the alternative that plaintiffs' Establishment Clause claims were barred by laches).